206 Md. 533 (1955)
112 A.2d 687
BALTIMORE TRANSIT COMPANY ET AL.
v.
PUBLIC SERVICE COMMISSION ET AL. (Three Appeals in One Record)
[No. 106, October Term, 1954.]
Court of Appeals of Maryland.
Decided March 24, 1955.
Motion for rehearing filed April 22, 1955.
Denied May 13, 1955.
*538 The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.
Richard F. Cleveland and Henry H. Waters for the Baltimore Transit Company.
Joseph Allen for the People's Counsel.
H. Donald Schwaab, Assistant City Solicitor of Baltimore, with whom were Thomas N. Biddison, City Solicitor, Edwin Harlan, Deputy City Solicitor, and Francis X. Gallagher, Assistant City Solicitor, on the brief, for the Mayor and City Council of Baltimore.
Walter R. Haile, Assistant County Solicitor for Baltimore County, with whom were Carroll W. Royston, County Solicitor, and Edward Paul Swiss, Assistant County Solicitor, on the brief, for the County Commissioners of Baltimore County.
Charles D. Harris, General Counsel, Public Service Commission, for the Commission.
HAMMOND, J., delivered the opinion of the Court.
The Baltimore Transit Company sought permission from the Public Service Commission to increase its basic fare from seventeen cents to twenty cents, the zone fare *539 from eight cents to ten cents, the student fare from eight cents to ten cents, and the limited stop fare from twenty cents to twenty-three cents. After hearings which extended over sixteen months, the Commission passed its order permitting an increase in the basic fare from seventeen to eighteen cents, keeping the limited stop fare at twenty cents, and raising the two other fares as requested by the Company. The Company asked the Circuit Court of Baltimore to vacate the order and enjoin the Commission from enforcing its provisions. The People's Counsel and the Mayor and City Council of Baltimore, jointly, asked the court to forbid any increase in fares. Baltimore County sought the same relief as the People's Counsel and the City. The three cases were consolidated, and heard together. The court dismissed the three bills of complaint, the effect being to affirm the order of the Commission.
Appeals were entered by the Transit Company, the People's Counsel and the City, and Baltimore County; they will be referred to hereinafter as "the Company", "the People", and "the County", respectively. The Company's contention is that the action of the Commission was unreasonable and unlawful and amounted to confiscation of its property. The People's basic position is that the Company's service was so bad that no increase in fares was required by law or should have been permitted. The County says that a basic fare of eighteen cents is unwarranted and even if it were warranted, that the zone fare and the student fare should not have been raised more than one cent, so that the same ratio would be maintained between the base fare and the special fares as has previously existed. On behalf of the Public Service Commission, the appellee, it is argued by its general counsel that the rate base used was fair and the return allowed thereon reasonable under the evidence in the case in which the increase in fares was sought and a companion case, the so-called service case, the record of which was incorporated in the fare case. It says that the evidence and the experience of the Company *540 combine to show that the fare allowed will provide a reasonable return in relation both to the rate base it determined to be fair and the quality of the service the Company renders, making due allowance for the difficulties under which street railways necessarily now operate, and the diligence and skill of the management, or lack of it, in meeting these difficulties. It suggests earnestly that all of the appellants should await further results under the new fares, both as to return to the Company and service to the public.
The background of the service case and the setting in which it and the fare case were conducted are apparent from the record. The inadequacies of urban mass transportation in Baltimore, as well as elsewhere, are not new. There has been a continuous decline in the number of riders. From 1945 to 1952, the decrease was approximately 41% throughout the country. In Baltimore, it was 39%. The operators of the transit system say that the decrease in riders induces the decline in service. There are said to be five chief causes of this decline which has been accompanied by a decrease in service and popularity. The public says that the decrease in service and efficiency induces the decline in riding and public goodwill. The first of the five factors is the tremendous increase in the number and use of automobiles. In the period referred to, automobiles in Baltimore and other cities increased about fifty percent. Nationally and locally, the number of passengers who ride on the lines of urban transit companies has decreased in the ratio that passenger car registrations have increased. The automobiles, which take away the riders from the transit systems, block the streets and, to a considerable extent, cause the conditions which lead to slow and faulty service. The second factor is the widespread acceptance of the five day week in industry and commerce. The third is the growth of suburban areas. Decentralization of trade and suburban living has increased the use of automobiles and lessened the use of public transportation, as has the development of television. Finally, decreasing *541 patronage and increasing costs have required numerous increases in fares and each increase adds to the otherwise caused steady decline in riders, a further decline, the size of which is in direct proportion to the change in the rate of fare.
In 1947 the Commission conducted a hearing as to the service of the Company, which brought about improvement in some particulars. In October, 1952, the Commission, on its own motion, ordered a further investigation of the service and facilities of the Company to determine whether it was complying with the mandate of the statute to furnish such as are "safe and adequate and in all respects just and reasonable" (Code 1951, Art. 78, Sec. 27). The service case consisted of extensive investigation by the general counsel of the Commission, testimony and exhibits of civic groups, large department stores, riders generally and the Company. Some months later, the application by the Company for increased fares was filed. Both the fare case and the service case terminated in opinions and orders of the Commission filed July 28, 1954, almost two years after the service case had started. In its opinion in the service case, the Commission set forth that the first report of the general counsel had shown the Company to lack a sincere desire to provide good service, that schedules were unrealistic, that there was an ever present eagerness to blame inadequacies on traffic conditions, and that the program of cutting maintenance expenses had been carried to unreasonable limits. It found that traffic conditions were responsible for much of the bunching and slowness of movement of vehicles, both fixed wheel and free wheel, that some of this could be avoided by diligent and adequate supervising, and that a new peak load formula for controlling the number of passengers allowed on a vehicle should be required. It further found: "That with respect to the service now being rendered by the Company, while the service on an overall basis has improved since the investigation was ordered by this Commission, yet there remains considerable room for further improvement *542 * * * there has been an improvement during the past year, nevertheless, there remains much to be accomplished. It is the plain duty of the Company to improve its service and to maintain the same at a proper standard. The Commission will insist that the Company take such steps as may be necessary to accomplish this end." An appropriate order was entered.
In the fare case, the Commission recognized, as do the parties here, that under the Maryland statutes and decisions, a regulated utility must be allowed a reasonable return on the fair value of the property used and useful in the public service. Since the decision in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 88 L.Ed. 333, the courts of some States have felt free to abandon the fair value test. See, for example, Utah Power & Light Co. v. Public Service Commission, 152 P.2d 542. This Court, in C. & P. Phone Co. v. Pub. Serv. Comm., 201 Md 170, the latest case on the subject, reached a contrary conclusion We decided there that the fair value test is explicit in the Maryland statutes, as the earlier decisions had made plain, so the ghost of Smyth v. Ames, 169 U.S. 466, 42 L.Ed. 819, still walks in Maryland. This being so, a finding of a fair rate base and the setting of a reasonable return thereon are requisite. Both the Company and the Commission took rather oblique approaches to these tasks, particularly the establishment of the fair value of the Company's property. It may be said that while both paid due respect to the Maryland rule, actually the philosophy of the Hope case exerted its influence in that both were interested mainly in the end result. The Company seemingly had decided as a starting point that annual net operating income of $2,000,000 was needed to maintain the corporate style to which it would like to be accustomed. To show how the twenty cent fare would produce this, it exhibited pro forma statements for years ending June 30, 1954 and January 31, 1955. These are arrived at by taking the known passenger totals, reducing them by the steady "economic decline" from factors *543 independent of rate of fare, estimated by one expert at 3% and by another at 4.3% a year, and again reducing them by the "resistance factor", that is, the decline in riders which result from each one per cent increase in fare, set at from .29% to .33% by the experts. The estimated number of passengers is multiplied by the applicable fare. Next, the passenger volume is translated into vehicle miles. Finally, from the number of vehicle miles is determined the expenses of operation. The difference between gross revenues and costs obviously is that number of revenue dollars expected to be realized from the fares as increased. Having shown by its figures that some $2,000,000 net would be produced each year by a twenty cent fare, the Company says any one of several rate bases would be agreeable to it, and at a reasonable rate of return, would support that much net income. Its book value, less book depreciation reserve, is $31,842,000 (its book value and that used by the Commission are identical  the Commission deducts some $7,000,000 more in accrued depreciation to reach its figure of fair value) and 6.3% on this, the lowest rate base suggested by the Company, would produce the income it asks for. Another suggested rate base would result from the deduction of $17,557,000  what an expert witness estimated to be actual existing depreciation  from book value. This gives a rate base of $39,000,000, which would require a return of only 5% to produce the revenue sought. A third suggestion is to credit the Company's book reserve of $25,264,000 at January 1, 1953 with $7,394,000, added to the depreciation reserve by a donation of the stockholders,  and not paid for by the public  according to the claim of the Company. This was done by a capital readjustment, whereby capital was reduced and capital surplus increased some $14,798,000 by reducing the par value of the preferred stock from $100 to $50 a share and the stated value of the common stock by about $3,000,000. On the Company's theory, only $17,870.000 could be deducted from book value, since the rest of the approximately $25,000,000 of the book reserve *544 has been contributed by the stockholders. This process would produce approximately the same result as the second formula. Finally, the Company offered the testimony of expert witnesses to show that the present value of its property, if book value be multiplied by appropriate cost indices, would be from $56,000,000 to $70,000,000, which would necessitate returns of 3.6% and 2.8%, respectively, to produce $2,000,000 a year.
The Commission's findings as to a fair rate base and reasonable return are largely, if not entirely, to be found in two passages of its opinion in the fare case. It said that its auditor, " * * * in computing the rate of return being earned by the Company, used the figure of $24,728,000 which he termed the Commission's rate base brought down to July 31, 1953. The starting point was the minimum rate base as of December 31, 1948 mentioned by the Commission in its decision of December 21, 1948 in Case No. 4930, with adjustments for subsequent changes in the property, and, by the same method, the figures as of December 31, 1953, would be $24,218,000. In each instance cash working capital of $500,000, the same amount as previously allowed by the Commission, is included and allowance is made for the actual materials and supplies on hand." The Commission then said that the establishment of fares for the applicant is not merely a matter of determining a rate base and fixing a rate of return but of keeping it in business and giving the public transportation, and finally it concluded that the fares which it allowed, "* * * based on the year ended May 31, 1954, which is the latest period for which figures are available in the records of the Commission, would have produced a return of slightly under 6% on the `minimum rate base' found by the Commission in the 1948 fare case, brought down to date, which includes an allowance of $500,000 for cash working capital * * *. This computation allows for the decline in riding which results from the increase in fare * * * and if we make allowance for the economic decline as well, a return of 5% should be realized." We take it, and the parties *545 seem to have proceeded on the same theory, that the Commission found the fair value of the Company's property to have been $24,728,000 as of July 31, 1953 and $24,218,000 as of December 31, 1953 (and that it would be $23,443,000 as of May 31, 1954)  a memorandum showing these figures was submitted to the lower court  and that a return on that rate base of between five and six per cent would be reasonable. Each of these bases, as has been noted, started with the minimum rate base found as of December 31, 1948 of $32,330,056. We think the language of the Supreme Court in a similar situation truly reflects the situation here. "The findings of the Commission in this regard leave much to be desired since they are quite summary and incorporate by reference the Commission's staff's exhibits on allocation of cost. But the path which it followed can be discerned. And we do not believe its finding are so vague and obscure as to make the judicial review contemplated by the Act a perfunctory process." Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 89 L.Ed. 1206, 1219.
The Company's chief complaints as to the rate base are two: first, that the Commission ignored present value and relied only on historical value, and second, that it erred in its use of excessive depreciation of the rail properties.
We think that a number of reasons point to the conclusion that the Commission did not act unlawully or unreasonably in following the course it did on both points.
In 1948, a sharp issue between the Company and the People's Counsel was whether the rate base should be fair value or cost figured by indices. In 1926, the Commission, after an investigation it says was "most searching and complete" found that the fair value of the Company's property as of December 31, 1923 was $75,000,000, of which $5,000,000 represented value of easements and $12,500,000 overheads. Its determination was largely on the basis of reproduction cost new as of December *546 31, 1923. The records of the Company and the Commission show subsequent additions and retirements of property. Using these actual figures, the Commission determined a 1948 minimum rate base of $32,330,056. It found that of the rail property valued at $70,000,000, as of 1923, there remained before depreciation, property of the 1923 value of $46,191,000. This was held to be subject to depreciation of 60%. The value of that which remained, plus the bus and rail property at book value, less book reserve for depreciation, together with an allowance for materials and supplies and $500,000 cash working capital, gave the figure set by the Commission as fair value in 1948. It expressly repudiated cost only as the basis of fair value. Reports of the P.S.C., Vol. XXXIX, p. 164. The Company acquiesced then in the rate base so found. It now vigorously attacks the finding of the Commission that the value of the remaining rail property was only 40% of its 1923 reproduction costs. In the 1948 case, the Company produced from the same nationally known engineering and valuation firm, whose experts were relied on in the pending case, an engineer who testified that proper depreciation for rail property should be 50%. The Commission in the 1948 case said: "His reasons for his conclusion were given in detail. Although he suggests an overall allowance of 50% depreciation, a careful reading of his testimony discloses that some of the items included in the total number comprised in the rail property accounts are assigned a rate of depreciation greater than 50%. For instance, he testified that the track accounts, representing $10,862,000 of book costs, or about 23% of the depreciable property, indicate a reserve requirement of about 58%, and that the shops and carhouses, representing $5,113,000 of book cost, or about 11% of depreciable property, indicate a 75% reserve requirement. With respect to substation equipment, representing $2,935,000 of book cost, he testified that an age-life calculation, resting solely upon the dates of installation of the individual units and the 50-year average life equivalent *547 to the 2% rate which he adopted for accrual purposes, indicated a reserve requirement of 62%. Rates under 50% were assigned to some of the items of depreciable property. A composite rate of 50% was, however, in his opinion, the proper allowance for depreciation." The expert for the People's Counsel in 1948 testified that the bulk of surviving property was railway and that: "* * * its doubtful future and its economical status as affected by competing forms of transportation, together with the obsolescence and deterioration apparent in much of the property, it seems reasonable to estimate more than sixty percent accrued depreciation." The Commission said that after considering this question of depreciation at length and after analyzing testimony of the experts: "* * * the Commission finds that depreciation should be computed on the basis of 60%. It must be borne in mind that much of the rail property is old and antiquated and that the usefulness of some of it will soon cease to exist, that portions of it will be converted to bus lines and that some of the property represents double facilities."
It is to be remembered that while a regulatory body must consider all relevant facts and factors in determining fair value, it is not bound to accept or use any given formula or combination of formulas. C. & P. Phone Co. v. Pub. Ser. Comm., 201 Md. 170, supra, so held, as it did that controlling effect need not be given reproduction cost or theoretical present day values of old assets.
Many cases have held that determination of fair value must reflect the reasonable judgment of the Commission, based on all relevant facts of which several only, or indeed but one, may prove to be controlling. In re N.J. Power & Light Co., 89 A.2d 26; Atlantic City Sewerage Co. v. Board of Public Util. Commissioners (N.J.), 26 A.2d 71, affd. 29 A.2d 850. In New England Tel. & Tel. Co. v. State (N.H.), 97 A 2d 213, 219, the Court adopted the language of Federal Power Com. v. Nat. Gas Pipeline Co., 315 U.S. 574, 586, 86 L.Ed. 1037, 1050, that: *548 "Agencies to whom this legislative power of rate-making has been delegated are free, within the ambit of their statutory authority, to make pragmatic adjustments which may be called for by particular circumstances." See also Chicopee Mfg. Co. v. P.S.C. (N.H.), 93 A.2d 820; New England Tel. & Tel. Co. v. State (N.H.), 64 A.2d 9; Georgia Rwy. & Power Co. v. Railroad Commission of Ga., 262 U.S. 625, 67 L.Ed. 1144; Los Angeles Gas & Elec. Corp. v. R.R. Comm., 289 U.S. 287, 77 L. Ed 1180; Railroad Commission of Calif. v. Pacific Gas & Elec. Co., 302 U.S. 388, 82 L.Ed. 319; Panhandle Eastern Pipe Line Co. v. Federal Power Comm., 324 U.S. 635, 89 L.Ed. 1241, 1251; Colorado Interstate Gas Co. v. Federal Power Comm., 324 U.S. 581, 89 L Ed. 1206; Market St. Rwy. v. Railroad Commission of Calif., 324 U.S. 548, 89 L.Ed. 1171. Much of the rate base is not seriously disputed. It consisted of the value of buses and other fairly recent acquisitions, the cost of which reflected current values. The remaining rail property is viewed by the Company as an asset to be valued at reproduction cost today  cost today figured theoretically by indices. The Commission takes a dim view of that value, and for this there seems to be justification. Since 1948, retirements have exceeded additions. After the fare case started a very considerable part of the rail property was given up and buses substituted. The starting point in value in 1923 for what now remains of the rail property, was then reproduction cost new, plus overheads. Some $3,000,000 of such overheads are still represented in the remaining rail property account. The Commission could have concluded from these two circumstances that the account was somewhat inflated in relation to present value. The 1948 figures were accepted by the Company without appeal. Code, 1951, Art. 78, Sec. 55 (c) provides that: "All final valuations by the Commission shall be prima facie evidence of the value of said property in proceedings had in pursuance of this Article." This is not to say that its failure to protest the 1948 value would bind or estop *549 the Company but certainly, its acquiescence in the rate base found and used by the Commission in 1948 must be put on the scale when there is weighed the lawfulness and reasonableness of the current finding. The record of the proceedings before the Commission and its opinion in the fare case show that it gave consideration to the Company's testimony as to current value. Necessarily, it would be difficult for the Company to sell that value to the Commission as fair value. It is hard to see how a disinterested appraiser of urban rail property could be persuaded to test its value by prices generally applicable to things for which there is a present demand or need. Where property is both old in years and obsolescent or obsolete as to function, reproduction cost and theoretical present values are particularly unrealistic. This was pointed out by Judge Henderson for the Court in C. & P. Phone Co. v. Pub. Serv. Comm., supra, at page 184 of 201 Md., where there was quoted an earlier opinion of the Commission as to reproduction cost: "In short, it is a theoretical reproduction of something which, as a practical matter if it did not exist, would not be produced * * *. As this highly theoretical process has questionable probative value in times of normal and stable economy, it has even less value at the present time." The Supreme Court found the idea sound in Market St. Rwy. v. Railroad Commission of Calif., 324 U.S. 548, 89 L.Ed. 1171, 1183, in which it said: "Apart from familiar objections to the reproduction-cost method, no responsible person would think of reproducing the present plant, consisting in substantial part of cable cars and obsolete equipment. There is no basis for assuming that anyone in the light of conditions which prevail in the street-surface railroad industry generally would consider reproducing any street railway system. It was no constitutional error to proceed to fix a rate in disregard of theoretical reproduction costs."
The Commission's choice of its own appraisal of the extent of accrued depreciation, in preference to the estimate of the expert witness as to actual existing depreciation, *550 finds support as to reasonableness from the record. Its basis in part was the 1948 testimony of the Company's own witness. This appraisal was fortified by experience from 1948 on. During that time, the abandonment of rail lines supported the Commission's view as to actual present value of the remaining rail property. The statements of the witness in the 1953 fare case, as to the time he spent and the thoroughness of his depreciation studies, makes the Commission's characterization of his effort as casual and sketchy not unjustified. We think, too, that the Commission was not required to adopt the theory of the Company that some $7,500,000 of depreciation reserve was a contribution by the stockholders. The capital readjustment, which brought this about, was necessary because the rail property had been retired, or had depreciated, to the point where additional capital surplus had to be set up, so that there would be an account against which to charge adequate depreciation reserve. The so-called contribution of the stockholders could be considered no more than a paper contribution. The Commission's duty is to find actual value and it was not obligated to heed a balance sheet change which did not affect the stockholders' equity or the market value of their holdings. The figure at which accrued depreciation is to be set, including the weight to be given to obsolescence, is necessarily and essentially a judgment figure. City of Pittsburgh v. Penna. Pub. Util. Comm. (Pa.), 78 A.2d 35, 41.
The People say the fair value of the property of the Company is not significant at the moment (although they think it no more than the Commission found) on the theory that it is entitled to no additional return, because of the gross inadequacy of its service. The People rely on statements, such as those in Smyth v. Ames, supra, that "What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered *551 by it are reasonably worth." They turn to Spring Valley Water Works v. City & County of San Francisco, 192 F. 137, where it is said (quoting Covington & L. Turnpike Road Co. v. Sandford, 164 U.S. 578): "`The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends'". Petition of New England Tel. & Tel. (Vt.), 66 A.2d 135, put it thus: "Rates follow service and a poor standard of service may afford a basis of a denial for a request for higher rates." In these cases and in others, the language relied on has been dictum. We have been referred to no case which has sanctioned the denial of a just and reasonable return where the utility is rendering substantially the service for which it is designed. In 32 Harvard Law Review 516, 529, Value of the Service as a Factor in Rate Making, Edgerton says: "In other words, all the talk of courts  including the Supreme Court itself  commissions and text-writers to the effect that rates may be fixed so low that they will not produce a reasonable return to the company, if that is necessary in order that they may not exceed the value of the service to the public, is baseless." In Elyria Tel. Co. v. Public Utilities Comm. (Ohio), 110 N.E.2d 59, 62, the Court said: "Although it may be true that there should be a connection between rates and service, the record here shows the company was rendering at least fairly adequate service." It found that the company was faced with emergency conditions during wartime in the face of unprecedented demand for services, and continued: "Under such facts, where the commission finds that rates being charged are inadequate it can not arbitrarily condition an increase in rates on an improvement of services and facilities. * * *
"A public utilty commission may not so act as to confiscate the property of a utility, and where it is determined that adequate rates do not exist, an order granting an increase but suspending the same until such time as certain facilities and improvements are provided does have that effect. Upon the record in this case, the commission *552 erred in suspending the increased rates until such time as the services and facilities have been improved." See also Duluth St. Rwy. Co. v. R.R. Comm. of Wis., 152 N.W. 887; and Covington & L. Turnpike Road Co. v. Sandford, 164 U.S. 578, 41 L.Ed. 560, 566.
We do not find it either necessary or appropriate to decide whether the theory of the People might be valid under some circumstances. The Commission chose to correlate the twin duties it has under the statutes  the duty of requiring the utility to furnish adequate service and the duty of seeing that it receives a reasonable return for the services rendered. It found an improvement in the service, and a need for further improvement, and simultaneously passed an order designed to bring about the further improvement and an order granting an increase which it held would bring a reasonable return on the fair value of the property of the Company. We think its actions were within its legal powers and a reasonable exercise of the duties imposed upon it by law. In City of Lexington v. Public Service Commission of Ky., 249 S.W.2d 760-763, the Court, assuming without deciding that under proper circumstances, a penalty rate could be invoked for inadequate service, said: "* * * we are of the opinion that the question of whether such a rate should be invoked is primarily one of regulatory policy to be determined by the Public Service Commission. In this case the commission did not choose to penalize the company for its inadequate service, perhaps in the belief that the only remedy for the inadequate service was to allow the company a sufficient income to enable it to provide needed extensions and improvements. We can not substitute our judgment for that of the commission."
We turn then to the reasonableness of the rate of return. There was before the Commission and the trial court the actual results of the Company's operations prior to and during the time that the hearings continued. For the twelve months ending July 31, 1953, net operating income was $1,797,774.49. Deducting the abnormal *553 benefit of a tax loss carry-over, the earnings for that period were $1,156,010.49. For the calendar year 1953, the Company earned net operating income of $1,342,922. Normalization of this figure to eliminate the tax loss carry-over shows net operating income of $1,165,433, or a return of 4.81% on the rate base. As the Court said in C. & P. Phone Co. v. Pub. Serv. Comm., supra: "Experience and not prophecy is the final test." The Commission furnished the lower court, at its request, and without objection from the parties, a memorandum which showed net operating income of $1,344,937 for the year ending May 31, 1954, using actual figures except that the increase it was assumed the eighteen cent fare would produce was taken into account. The minimum rate base found by the Commission, adjusted to May 31, 1954 was $23,443,000. On this rate base, the Company would have earned 5.7% on the figures supplied by the Commission for the year ending May 31, 1954. As is pointed out in the opinion of the lower court, during 1953 and the early part of 1954, the Company resumed dividends on both its preferred and common stock. The 1953 dividend on the common stock was the first paid in twenty-seven years and was at the rate of fifty cents a share  a total of over $400,000. A dividend of sixty-five cents a share was paid for the year 1954. Further, the debenture sinking fund was increased and $1,500,000 of preferred stock was redeemed, including that held by the Company's controlling stockholder. All of this occurred after the application for increased fares had been filed. In testing the Company's predictions of operating income, less operating expenses, the Commission may well have doubted the accuracy of the Company's estimates of expense. The number of miles it estimated it would operate was a foundation  on a mileage unit basis  for much of the estimate of $17,000,000 of operating expenses. Labor and material costs were so estimated to be $13,000,000. While the hearings were in progress, applications for reductions in service of about one million, *554 three hundred thousand service miles per year were filed. Witnesses testified that usually service miles decline in the ratio of about two-thirds of the decline in passengers. Here, for some time, the decline in service miles had substantially exceeded the decrease in passengers.
An expert witness for the Company testified that a reasonable return on the fair value of its property would be 9%. He found the average return on the market value of all the securities of twenty transit companies to be 8.94% and that, therefore, a return of 9% was reasonable. His estimates for cost of money were based on market value but were applied by him to the value of the physical assets of the Company. Further, he gave no consideration to the actual service cost of the Company's debt and preferred equity, and he included in the common equity, the capital surplus created by the capital readjustment of January 1, 1954. The fixed annual charges for debt outstanding as of January 1, 1954 amount to $418,453, that for preferred stock then outstanding, $478,592, or a total of $897,045. If the estimate of the Commission showing actual operations for the year ending May 31, 1954, recalculated at the eighteen cent fare, is relied on, net operating income would have been $1,344,937. Deduction of the $897,045 preferred charges would leave $457,092. The common equity, as of January 1, 1953, consisted of common stock of $869,423 stated value and $374,161 earned surplus, or a total of $1,243,504, if the capital surplus is ignored. $457,092 is a return of approximately 37% on the figure of $1,243,504. If it be assumed that there had been no capital readjustment and the $3,000,000 which was cut from the stated value of the common stock be added to the figure of $1,243,549, a yield of over 10% would be afforded by the income available for the common equity. If the capital surplus of $6,000,000 created on paper, at least, by the capital adjustment, be used as a yardstick, the common equity would be some $7,240,000. The yield on this from the income of $457,000 would *555 be about 6.3%. None of these returns seems unreasonable or to approach the confiscatory. In Chicopee Mfg. Co. v. P.S.C. (N.H.), supra, 93 A.2d (826), the Court said: "The rate of return of 5.65% equates to a return of 10.90% on the actual equity * * * and so, `whether generous or ungenerous, is at all events not confiscatory.'" Cf. also Panhandle Eastern Pipe Line Co. v. Federal Power Comm., 324 U.S. 635, 89 L.Ed. 1241, 1251.
Even though lack of value of the service may not be relied on to deny a reasonable return to a utility, the regulatory body may weigh that value in judging whether the return for the service is reasonable. There is no requirement that there must be any given percentage of return on the fair value of property. Between the lowest return that is not unreasonable to the point of being confiscatory and the highest that is not inordinate, there is a rather wide zone in which a return may be reasonable under some circumstances and not under others. In deciding that the return allowed was reasonable, the Commission took into account, as it pointed out, that the Company does not enjoy a monopoly, as other utilities do, that its business is shrinking while that of the others is growing, that they need more capital for increased service and it does not. Again, increased rates do not diminish the number of their patrons nor the extent of the use. The continuing falling off of traffic in every year since 1943, regardless of fare changes, has been accelerated by every increase in fare. The Commission noted that this is true throughout the United States. Subsidies have been granted in some instances of private ownership and public transit authorities have been created to operate, tax free, systems formerly privately owned. The Commission said: "* * * we are approaching, if we have not already reached, the point where further increases will be of little assistance in maintaining the financial position of the Company." It was shown that the Company has reduced its service to the public to *556 the point where it now provides 10% less service than it did in 1937, for 15% more passengers that it served in that year, and these passengers are now paying a 1954 fare of eighteen cents for less service than the 1937 fare of ten cents purchased. We think that the Commission was entitled to consider that the point of diminishing return was being approached, if it had not already been reached, and that the granting of the one cent increase, rather than the three cents asked, was reasonable under all the circumstances. In Miles v. Public Service Commission, 151 Md. 337, it was pointed out that the Commission has the power to: "* * * require safe and adequate service to the public and to fix such rates as, on the one hand, will be reasonable to the user of the utility and commensurate with the service rendered, and, on the other hand will produce a fair and reasonable return upon the property * * *." In Public Serv. Comm. v. United Railways & Elec. Co., 155 Md. 572, Judge Offutt said for the Court: "Whether a given rate is burdensome to the public, involves the question of the value of the service, and presents an extremely difficult and troublesome question, the answer to which, except in extreme cases, can only rest in the judgment of the commission, operating upon varying factors, each of which is entitled to some weight, but no one of which ordinarily is controlling."
As we see it, the Commission, as long as it set a rate of return not unreasonable to the point of being confiscatory, had a zone of discretion in which to consider not only the decline in the number of riders but also the inevitable decline which has followed and has made the service worth less to the public than it formerly was. The Courts have recognized this right in regulatory bodies. In Market St. Rwy. Co. v. R.R. Comm. of Calif., supra, the order of the Commission which reduced fares was attacked as invalid because it was based in part on the so-called value of service theory. The Court said: "The question whether a confiscatory rate can be justified because service is bad can only be reached when *557 we find a prescribed rate to be confiscatory. As we do not find this rate to be such, we do not need to pronounce upon the abstract doctrine as to the validity of the `value of service' theory as justifying rates that do not yield a fair return." Later, the Court said: "* * * the Commission did not put a monetary value on a street car ride as the basis of the fare. * * * it found that the public * * * was receiving no more transportation service for seven cents than it had received at five, and at the same time the Company was not receiving increased revenues because the price of the service had exceeded the value that the public put upon it and it had thereby withdrawn its patronage.
"Certainly the due process clause of the Constitution is not violated when a commission takes into consideration practical results to the public of advances which it has allowed in rates. To the extent that the Commission was influenced by considerations of the value of the service in this case, we find nothing that denies the Company any rights possessed under the Federal Constitution."
In San Diego Land & Town Co. v. Jasper, 189 U.S. 439, 47 L.Ed. 892, Mr. Justice Holmes noted for the Court that a drought would tend to depreciate the market value of a water plant and "* * * very much depreciate the value of the services rendered to consumers * * *", and indicated that the regulatory body could, as it apparently had, give this fact consideration in the establishment of rates. In Oklahoma Natural Gas Co. v. State of Okla., 258 U.S. 234, 66 L.Ed. 590, the Court held that where a natural gas corporation allowed pressure to fall to a point which caused inadequate service to consumers, the regulatory body was justified in ordering refunds to consumers from the regular rates and that no constitutional right was infringed by the order. In Petition of New England Tel. & Tel. Co. (Vt.), 66 A.2d 135, 147, the Court said: "* * * if it should appear that consumers are not being adequately served because of fault on the part of the company, due to *558 inefficiency or improvidence or other like reasons, the commission should take such inadequacy, and its extent, into consideration in determining the rates to be fixed to the end that a reasonable return, under the circumstances, will result." In Covington & L. Turnpike Road Co. v. Sandford, 164 U.S. 578, 41 L.Ed. 560, supra, the Court said that regulation which limited dividends to 4% would not be held unconstitutional where new modes of transportation had diminished the use of a toll road and the amount of tolls collected. See also Lewis v. M. & C.C. of Cumberland, 189 Md. 58, 68; and Value of the Service as a Factor in Rate Making, 32 Harvard Law Review, supra, at pages 548, et seq. and 556.
In the case before us, we find no showing that the Commission's order produced a confiscation of the Company's property. We think that such consideration as the Commission gave the value of the services rendered, in fixing the rate of return, neither infringed any constitutional right of the Company nor affronted any statute.
The burden of proof is upon the one who complains of the validity of an order of the Commission. Its orders prima facie are correct and to its judgment is accorded the respect due an informed body aided by a competent and experienced staff. Bosley v. Quigley, 189 Md. 493, 505; Hessy v. Capital Transit Co., 193 Md. 265, 270; Baltimore Transit Co. v. Hessey, 196 Md. 141.
This Court does not sit as a board of revision. Whether any vitality remains in the rule that the owner of the utility is entitled to the independent judgment of the reviewing court on both the laws and the facts, after the decisions of the Supreme Court in Nebbia v. New York, 291 U.S. 502, 78 L.Ed. 940, and the Hope case, or whether the Court has made the full circle back to the rule of Munn v. People of Illinois, 94 U.S. 113, 24 L.Ed. 77, we need not decide. Even the independent judgment rule "does not require or justify disregard of the weight which may properly attach to findings upon *559 hearing and evidence," as was pointed out in C. & P. Phone Co. v. Pub. Serv. Comm, 201 Md. 170, 186, supra. We think that none of the parties met the burden of proof of showing that the Commission lacked evidence to justify its findings or that it misconstrued the facts or the law. Its determination of fair value and proper return would seem to have been within the zone of reasonableness. If experience shows that this is not true, the Company can seek relief.
We find no substance in the claim of the County that the allowance by the Commission of the zone fare and the student fare was discriminatory or unreasonable.
Decree affirmed, with costs.