THE POTOMAC EDISON COMPANY *v.* PUBLIC
SERVICE COMMISSION OF MARYLAND ET AL.

[No. 124, September Term, 1976.]

*Decided March 2, 1977.*

574

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ., and ROBERT F. SWEENEY, Chief Judge of the District Court of Maryland, specially assigned.

*Samuel M. Sugden,* with whom were *Robert J. Glasser, LeBoeuf, Lamb, Leiby & MacRae, Philip J. Bray* and *Robert B. Murdock* on the brief, for appellant.

*Donald F. Rogers, Assistant People's Counsel,* with whom was *John K. Keane, Jr., People's Counsel,* on the brief, for People's Counsel, Public Service Commission, part of appellees. *Joseph Sherbow,* with whom were *Edward F. Shea, Jr.,* and *Sherbow, Shea & Doyle* on the brief, for Howmet Corporation, part of appellees. *James A. Pine, General Counsel,* and *Kirk J. Emge, Assistant General Counsel,* for Public Service Commission of Maryland, other appellees.

Levine, J., delivered the opinion of the Court.

In this appeal, the Potomac Edison Company (Potomac) seeks reversal of a decision of the Circuit Court for Washington County (Rutledge, J.) upholding an order entered in a rate proceeding by the Public Service Commission of Maryland (the commission). Potomac appealed the circuit court decision to the Court of Special Appeals, but we granted certiorari prior to consideration of the case by that court. The other parties to this appeal, in addition to the commission itself, are the People's Counsel and Howmet Corporation, which, as a substantial purchaser of electricity from Potomac, was granted leave to intervene at the commission level in opposition to Potomac's requested rate increase. We affirm.

On October 1, 1974, Potomac filed an application and revised schedules of electric rates designed to produce an additional $11,900,000 in annual gross revenues, an increase of 22 percent over its rates then in effect. Pursuant to Maryland Code (1957, 1969 Repl. Vol., 1974 Cum. Supp.) Art. 78, § 70, the commission suspended the revised rate schedules for a period not to exceed 120 days (later extended for an additional 30 days) from October 31, 1974, and also instituted proceedings to determine whether the proposed rates were "just and reasonable" within the meaning of Art. 78, § 69 (a). It is from those proceedings that this appeal arises. Prior to a hearing on the application, the commission, acting under Art. 78, § 71, granted Potomac's emergency application, and authorized Potomac to file revised temporary rates that would produce not more than an additional $5,454,000 in annual gross operating revenues. This action resulted in a surcharge of 10.16 percent on all customer bills.

Potomac is a wholly owned subsidiary of Allegheny Power System, Inc. (APS), a holding company operating two other subsidiaries, West Penn Power Company and Monongahela Power Company. Potomac renders service throughout Garrett, Allegany, Washington and Frederick Counties, and in parts of Montgomery, Carroll and Howard Counties. It

also provides service in parts of Pennsylvania, Virginia and West Virginia.

The application in controversy was the third filed by Potomac within a period of some 41 months. In April 1972, the commission granted Potomac a rate increase designed to produce over $4,000,000 of additional revenue based upon an allowed rate of return of 7.94 percent. On May 31, 1974, the commission permitted Potomac to increase its rates by $5,645,192 with an allowed rate of return of 8.2 percent. Four months later, Potomac filed the application in dispute here, seeking a 9.9 percent rate of return. In the pre-hearing stages, the parties, in accordance with the established practice of selecting a fixed "test period" for determining revenue requirements, agreed upon the 12-month period ending September 30, 1974. Although the evidence presented before the commission's hearing examiner was voluminous, we shall attempt a relatively brief summary.

In common with many other public utilities throughout the nation, Potomac found itself plagued in 1974, as a consequence of inflation and rising interest costs, by an attrition of earnings (a term frequently used in utility rate proceedings and defined succinctly by Potomac as "a disproportionate growth in the [plant] expenses of providing public service which is not matched by a corresponding growth in revenues"). To compound this problem, Potomac's ability to issue new long-term indebtedness was attenuated by applicable legal requirements. Pursuant to the Public Utility Holding Company Act of 1935, Potomac's bond indenture restricts it from issuing such debt if pre-tax earnings fall below 2.0 times its outstanding interest costs for any consecutive 12-month period within the latest 15 months. Wholly apart from this legal impediment to the issuance of long-term indebtedness was Potomac's concern that its recent earnings experience would impair its bond rating, and thus affect its ability to attract institutional investors.

An element in arriving at the "reasonable return" standard set by Art. 78, § 69 (a) is the "fair value" of the utility company's property, that is, its "rate base." A key

issue in this case was whether, as advocated by Potomac, its record of performance during the test period should be calculated by a "terminal" (end of period) rate base, that is, as of September 30, 1974, the final day of the test period, or whether an "average" rate base (the average of the 12 months) should be applied. Potomac justified adoption of a terminal rate base by pointing to the erosion of its earnings caused by plant replacement at increased costs (attrition). The commission, moreover, had applied a terminal rate base in the two prior Potomac cases. Evidence presented by the People's Counsel supported a weighted average rate base on three grounds: First, Potomac earned its net income over the entire 12-month period; secondly, as the intervals between rate cases diminish, each case becomes a review of the immediate past and the resulting rates are geared to the immediate future; finally, a hedge against attrition is developed by factoring into the income statement known increases in expenses of the entire year.

Pursuant to the recommendations of its auditor and the hearing examiner, the commission, with one member dissenting, applied the average rate base. Under Potomac's calculations, the terminal rate base was some $8,000,000 greater than the average rate base. Because of modifications made by the commission, this difference was reduced by approximately $1,000,000. Use of the terminal rate base, of course, would result in a larger rate increase.

Evidence presented by Potomac supported a rate of return related to its own capital structure ratios, long-term debt and preferred stock, rather than those of APS, but recognized that the common equity cost rates of the parent corporation should be employed because of Potomac's status as a wholly owned subsidiary. Potomac's witnesses maintained that each subsidiary owned by APS should be judged, as to bonds and preferred stock, on its own individual performance, since Potomac's bonds are not guaranteed by APS or the other subsidiaries. The evidence presented by the People's Counsel, however, favored reliance on the APS cost rate of long-term debt capital in conformity

with the commission's decisions in the two prior Potomac cases.

The commission, on the recommendation of the hearing examiner, followed the precedent which it had set in the two prior Potomac cases, and considered the capital structure of APS in testing the reasonableness of the proposed rates. In essence, the commission appears to have reasoned that APS, as the sole owner of Potomac's common stock, would exercise significant controls over the subsidiary, and that purchasers of Potomac bonds would expect APS not to remain oblivious to a possible default.

In the face of Potomac's evidence that a fair rate of return would be 9.9 percent, the People's Counsel countered with equally expert opinion that the fair rate of return should be no greater than 8.50 percent. The commission adopted the hearing examiner's finding that the fair rate of return should be 8.60 percent, which, when applied to the average rate base of $199,882,000 for the 12-month period ending September 30, 1974, would yield an increase in gross annual revenues of $4,829,000.[1]

The commission order was affirmed on appeal to the circuit court, which ruled that the commission had not erred in considering the capital structure of the parent corporation. The court further found that the commission had not acted capriciously or unreasonably, or without substantial evidence to support its decision. We agree.

Potomac presents two broad-brush contentions on this appeal. First, it urges that the rate of return fixed by the commission is unreasonable and not supported by substantial evidence. Second, it contends that the commission was unreasonable, arbitrary and capricious in failing to allow for the attrition which it had experienced during the test year.

---

1. Since the temporary rates had been calculated to produce $5,454,000 on an annual basis, Potomac was required by the commission order to file a plan for returning excess rates collected while the temporary rate order was in effect.

## (1)

In rate proceedings, it is the statutory duty of the commission to determine "just and reasonable rates." Art. 78, § 68. To comply with this standard, as we indicated earlier, the commission is required to fix rates which are designed to yield "a reasonable return upon the fair value of the company's property used and useful in rendering service to the public," Art. 78, § 69 (a), that is, upon the company's "rate base." *See Public Serv. Comm'n v. Balto. Gas & El.*, 273 Md. 357, 363, 329 A. 2d 691 (1974). The statutory test in Maryland, therefore, is the embodiment of the "fair value rule." *Balto. Trans. Co. v. Pub. Ser. Comm.*, 206 Md. 533, 542, 112 A. 2d 687 (1955); *C. & P. Phone Co. v. Pub. Serv. Comm.*, 201 Md. 170, 179-80, 93 A. 2d 249 (1952). Accordingly, the ascertainment of a fair rate base and the setting of a reasonable return thereon invariably become the focal points of the typical rate proceeding.

There are two facets to Potomac's attack on the rate of return set by the commission, the first of which appears to be more of a mathematical exercise than a legal argument. The principal expert witness for Potomac testified that the cost rate required to attract new common stock investors to APS had increased progressively from 7.74 percent in 1969 to 12.15 percent in early 1974, and that, in his opinion, the proper cost rate to be applied in this proceeding to Potomac's common equity, which constitutes about 33 percent of its total capital, was 15.00 percent. This opinion as to common equity cost was linked directly, of course, to the witness's ultimate recommendation of a 9.9 percent return to Potomac's overall cost of capital.[2]

The principal expert witness for the People's Counsel, on the other hand, rendered the opinion that the proper cost rate of common equity capital to APS, and thus to Potomac,

---

2. The rate of return equals the sum of (1) the cost rate to attract common equity times the ratio of common equity to total capital, plus (2) the cost rate to attract preferred stock times the ratio of preferred stock to total capital, plus (3) the cost rate to attract debt times the ratio of debt to total capital.

was between 11.75 and 12.25 percent, and that therefore the fair rate of return should be no more than 8.50 percent.

Potomac complains here because the commission, on recommendation of the hearing examiner, settled on 8.60 percent as a fair rate of return, which, when related to the capital structure and other cost rates advocated by the People's Counsel expert, would allegedly produce a return on common equity of over 12.00 percent. As we perceive Potomac's argument, it is that the commission, while professing to allow for a 12.00 percent return on common equity, actually provided for only 11.16 percent; hence, its "rate of return decision is internally inconsistent," and is therefore unreasonable. The short answer to this contention is that the commission's rate of return determination was based upon adoption of the consolidated APS capital structure and senior embedded costs, whereas the example employed by Potomac to yield the 11.16 percent figure uses its own capital structure and senior embedded costs. In actuality, then, Potomac's quarrel with the rate of return determination comes down to its dissatisfaction with the commission's adoption of the APS capital structure and senior embedded costs.

In Potomac's view, the commission's reasoning in adopting the APS capital structure for its rate of return determination was defective. The argument that APS will not stand aloof while Potomac defaults is irrelevant, it says, because APS is, in any event, not legally liable for Potomac's senior capital obligations. Moreover, the result of the commission's use of the consolidated capital structure is that Potomac's Maryland customers are being subsidized by the company's customers in other states and by the customers of its sister companies.

The commission's adoption in this case of the APS capital structure and senior capital cost rates was hardly unprecedented. It had followed the same practice in the two prior Potomac cases without being challenged on appeal. It is appropriate to consider the underlying capital structure of the system in any parent-subsidiary situation. 1 A. Priest, *Principles of Public Utility Regulation* 214 (1969); *cf. C. & P.*

*Phone Co. v. Pub. Serv. Comm.*, 201 Md. at 189-90 (commission considered tax savings arising from relationship between capital structures of parent and subsidiary). We find the reasoning of the commission in this instance persuasive. It is APS which issues its common stock to the public, and it is APS which determines whether to invest the proceeds in Potomac or to cause the latter to issue its own bonds or preferred stock directly to the public. Although Potomac is, of course, correct in arguing that its investors cannot look to the parent company in the event of default, the commission could nevertheless reason under the evidence, as it did, that those investors would not expect APS to ignore such possible circumstances.

A subsidiary challenge is leveled at the rate of return fixed by the commission on the ground that it rested in part on the depressed state of the economy in Potomac's service area. In recommending a rate of return closer to that advocated by the People's Counsel expert, the hearing examiner, "[b]eing cognizant of the present economic situation as it exists in the Company's service area," considered "[t]he ability of the Company's customers to pay increased rates ...." Potomac attacks this basis for the recommended rate of return, despite the overwhelming evidence to support it, as lacking in validity. Clearly, it was not inappropriate for the commission to consider local economic conditions in arriving at a reasonable rate of return. Inherent in the rate making process is "a balancing of the investor and the consumer interests." *Power Comm'n v. Hope Gas Co.*, 320 U. S. 591, 603, 64 S. Ct. 281, 88 L. Ed. 333 (1944); *see C. & P. Phone Co. v. Pub. Serv. Comm.*, 201 Md. at 189-90.

What Potomac overlooks is the discretion conferred upon the commission in determining the rate of return and, more importantly, the limited nature of our role on judicial review. As we said in *Balto. Trans. Co. v. Pub. Ser. Comm.*, 206 Md. at 555:

"... There is no requirement that there must be any given percentage of return on the fair value of property. Between the lowest return that is not

> unreasonable to the point of being confiscatory and the highest that is not inordinate, there is a rather wide zone in which a return may be reasonable under some circumstances and not under others. . . ."

In sum, this means that the return must be reasonably sufficient to assure confidence in the financial soundness of the utility and must be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. *Bluefield Co. v. Pub. Serv. Comm.*, 262 U. S. 679, 693, 43 S. Ct. 675, 67 L. Ed. 1176 (1923).

Article 78, § 97 delineates very strictly the scope of judicial review on appeals from the commission:

> "Every final decision, order, rule or regulation of the Commission shall be prima facie correct and shall be affirmed unless clearly shown to be (1) in violation of constitutional provisions, or (2) not within the statutory authority or jurisdiction of the Commission, or (3) made upon unlawful procedure, or (4) arbitrary or capricious, or (5) affected by other error of law, or (6) if the subject of review is an order entered in a contested case after hearing, such order is unsupported by substantial evidence on the record considered as a whole."

Consequently, decisions of the commission are prima facie correct, and its judgment is accorded the respect due an informed body that is aided by a competent and experienced staff. *Balto. Trans. Co. v. Pub. Ser. Comm.*, 206 Md. at 558. Our inquiry, then, is limited to a determination of whether there was illegality or unreasonableness in the commission's action; when that inquiry is finished, judicial scrutiny ends and the judicial function in the rate making process is over. *Balto. Gas Co. v. McQuaid*, 220 Md. 373, 382, 152 A. 2d 825 (1959). In recognition of our limited role, therefore, we have repeatedly held that a reviewing court may not substitute its

judgment for that of the commission. *Public Serv. Comm'n v. Balto. Gas & El.*, 273 Md. at 362.

Applying these well-settled principles, we cannot say that the decision of the commission on the rate of return was arbitrary, capricious, unreasonable, or unsupported by substantial evidence. That the 8.6 percent rate was closer to the 8.5 percent recommended by the People's Counsel expert than it was to the 9.9 percent rate of return offered by the Potomac expert does not remove the commission result from the zone of reasonableness. What matters above all else is that there was substantial evidence to support it.

(2)

The second major contention advanced by Potomac is that the commission failed to make any provision for attrition, a phenomenon which we described thusly in *Balto. Gas Co. v. McQuaid*, 220 Md. at 381:

> ". . . 'Attrition' is the term applied to the reduction in the rate of earnings resulting from additions to plant at costs higher than the value of similar items in the rate base, so that the relation between rate base and rate of return deteriorates from the company's point of view. When plant must expand rapidly and substantially to meet demands for service, as is now true in the case of the Company, and generally, the diminishing effect upon the overall rate of return is great."

*Accord, Public Serv. Comm'n v. Balto. Gas & El.*, 273 Md. at 364 n. 3. Potomac argues strenuously that the evidence of attrition was uncontradicted; yet, the commission failed to compensate for it in fixing the rate base. It points to the testimony of its comptroller that so dramatic had been the degree of attrition experienced by Potomac that the rate of return granted to the commission only five months earlier, in the last Potomac case, had not been achieved. Indeed, another of its witnesses expressed the opinion that the 15.00 percent return on common equity would not be attained even if the commission were to authorize it. He testified that

the then current overall rate of return, in consequence of the degree of attrition, was 6.69 percent as opposed to the 8.20 rate authorized by the commission in its May 1974 decision. Potomac reinforces this with a reference to the testimony of the commission's own auditor that the achieved rate of return during the test period was 7.58 percent.

However "uncontradicted" the evidence of attrition might have been, that fact would not be dispositive of the issue before the commission, nor on this appeal. First, Potomac's own expert, in recommending a 15.00 percent cost rate for common equity capital, conceded that "the degree of attrition [would] be less in the next year or two compared with the recent year or two . . . ." Nowhere is it written, moreover, that the commission is bound to accept uncontradicted testimony. *Cf. Public Serv. Comm'n v. Balto. Gas & El.*, 273 Md. at 373 ("The Commission thus had before it only one expert's opinion concerning the appropriate rate of depreciation, and could use its expertise to evaluate the expert's testimony and to accept or reject it").

What Potomac ultimately contends for is that the commission be reversed for its adoption of an average rate base. A terminal rate base, it maintains, would have been the proper antidote for attrition — and the inflation and regulatory lag responsible for it. As precedent for its position, Potomac argues that a terminal rate base had been adopted in its prior cases.

The very same issue presented here arose in *Public Serv. Comm'n v. Balto. Gas & El.*, 273 Md. at 363-71. As Chief Judge Murphy there said for the Court, that "inflation, attrition, and regulatory lag may exist does not mandate the Commission's use of a terminal rate base to resolve these problems." *Id.* at 368. We noted there that the commission had made other adjustments to compensate for inflation. It did so here as well, although not to an extent deemed adequate by Potomac. The fact remains, however, that it did increase the average rate base provided in Potomac's own calculations by approximately $1,000,000. Nor is the commission any more bound here by its prior use of a terminal rate base for Potomac than it would have been

bound by its prior use of the average rate base in *Balto. Gas & El.*

Alternatively, Potomac argues that given the adoption in this case of an average rate base, the commission should have compensated for attrition by some other means, such as an attrition allowance, an increase in the rate of return, or a more meaningful increase in the fair value increment than that actually allowed. If there is one point that we have sought to make in prior rate cases, it is that while a regulatory body must consider all relevant facts and factors in determining fair value, it is not bound to accept or use any particular formula or method. Determination of fair value must reflect the reasonable judgment of the commission, based on all relevant facts of which only several, or indeed but one, may prove to be controlling. *Public Serv. Comm'n v. Balto. Gas & El.*, 273 Md. at 366-67; *C. & P. Tel. Co. v. Public Service*, 230 Md. 395, 404, 187 A. 2d 475 (1963); *Balto. Trans. Co. v. Pub. Ser. Comm.*, 206 Md. at 547.

The commission's response to the problem of attrition, beyond increasing the rate base by $1,000,000, was to suggest, by its adoption of the hearing examiner's findings, that the current experience of brief intervals between rate applications will have the practical effect of confining its review to "the immediate past"; consequently, the rates which it sets will likely apply only to "the immediate future." In this very connection, we noted in *Public Serv. Comm'n v. Balto. Gas & El.*, 273 Md. at 370, that the existence of relatively short periods between rate cases "demonstrates the ability of the Commission to respond quickly to the Company's request for rate increases and thus constitutes an effective means of correction for attrition."

We recognize, of course, that the commission's approach to the problem of attrition does not conform to the recommendation of Potomac's experts. But the Legislature has wisely committed the resolution of such questions to the judgment of the commission, subject only to the requirement that its decision not be unconstitutional, without statutory authority or made upon unlawful

procedure, arbitrary or capricious, or unsupported by substantial evidence. We think that Potomac has not met its burden of establishing any of these grounds for reversal. To hold otherwise would require that we violate a clear statutory command, and substitute our own judgment for that of the commission.

*Judgment affirmed; appellant to pay costs.*