PEOPLE'S COUNSEL *v.* PUBLIC SERVICE COMMISSION ET AL.

[No. 231, September Term, 1982.]

*Decided November 5, 1982.*

The cause was argued before LOWE, WILNER and WEANT, JJ.

*Donald F. Rogers,* with whom was *John K. Keane, Jr.* on the brief, for appellant.

*Kirk J. Emge* and *James A. Pine,* with whom was *Sandra L. Hall* on the brief, for appellees.

WILNER, J., delivered the opinion of the Court.

People's Counsel to the Public Service Commission pursues this appeal from an order of the Commission granting a rate increase to taxicabs operating in Baltimore City. His complaint is that, in deciding to grant the increase, the Commission looked at only one item of expense — the cost of gasoline — and did not consider the overall financial condition of the taxicab companies. As a result, he says, the Commission failed to act in accordance with Md. Code Ann.

art. 78, §§ 69 and 84, and passed an order "that is without statutory authority, arbitrary and capricious, made upon unlawful procedure, and unsupported by substantial evidence on the record considered as a whole."

These arguments were presented to the Circuit Court of Baltimore City without success. The Commission believes that the lower court acted properly in rejecting People's Counsel's complaint. In a cross-appeal, it argues also that, because People's Counsel failed to comply with Maryland Rule B12 in prosecuting his appeal to the Circuit Court, that court should never have entertained the appeal in the first place. We shall affirm the judgment entered below.

### (1) *Commission's Cross-Appeal*

The Commission's order, from which the initial appeal was taken, was issued December 11, 1980. People's Counsel took his appeal to the Circuit Court of Baltimore City on January 8, 1981, by sending to the clerk of that court an order for appeal and a "Petition On Appeal." *See* Maryland Rule B2. Presumably in an attempt to comply with Maryland Rule B7a, the Commission's Executive Secretary, on February 2, 1981, sent the record in the case to:

"Mr. Elmer O. Harris, Clerk
Circuit Court of Baltimore City
Room 425, Civil Court Building
111 N. Calvert Street
Baltimore, Maryland 21202"

Mr. Harris was not the clerk of the Circuit Court; nor was Room 425 the office of that court. Mr. Harris was the clerk of the Baltimore City Court, and Room 425 was the office of the clerk of the Baltimore City Court. Notwithstanding that the Executive Secretary's covering letter clearly noted that the case was docketed in the Circuit Court (and even made reference to the correct docket and file numbers), Mr. Harris or one of his assistants redocketed the appeal in the Baltimore City Court and proceeded to recaption all of the pleadings accordingly.

The next day — February 3, 1981 — Mr. Harris sent to People's Counsel a "Notice Sent In Accordance With Maryland Rule B-12," advising that on February 3 he had received "from the Administrative Agency, the record in the above captioned case." The case was captioned properly in all respects save one: It showed the case as being in the Baltimore City Court.

People's Counsel made no response to the clerk's notice. On February 6, the Commission and "The Taxicab Owners of Baltimore City" filed answers, in the Circuit Court, to the appeal. On March 13, 1981, the Commission moved, in the Baltimore City Court, to dismiss the appeal on the ground that it was filed in the wrong court. With the consent of all parties, Judge Albert Sklar remedied that problem by transferring the case to the Circuit Court where, in accordance with Md. Code Ann. art. 78, § 91, the case belonged.

On April 3, 1981, the Commission struck again at the appeal, moving to dismiss because of People's Counsel's failure to file a memorandum of law within thirty days of the clerk's February 3 notice, as required by Maryland Rule B12. People's Counsel, with justifiable embarrassment, responded that he had failed to comply with the rule because he was unaware of it. He argued in mitigation, however, that (1) the rule was a new one, having taken effect on January 1, 1981; (2) it had not, as of then, been published in Vol. 9C of the Maryland Code, where the other rules are located; (3) the notice in any event was a nullity since it was sent by a clerk who had no jurisdiction over the case; (4) the Commission was not prejudiced by the lapse; and (5) dismissal of the appeal was an unnecessarily harsh sanction. The required memorandum of law was filed with that response on April 10, 1981.

The court denied the Commission's motion. Acknowledging that the memorandum was thirty-nine days late, the court noted:

"[I]t is also true that this Rule became effective a little more than one month before the said 30 day period begain to run. Appellant should have been

more diligent in apprising himself of the Rules of Procedure; but the imposition of the ultimate sanction of dismissal appears too harsh under the particular facts and circumstances present here."

Carefully ignoring its own negligence in transmitting the record to the wrong person (thereby violating its duty under Maryland Rule B7), the Commission continues to play "hardball" with People's Counsel by analogizing Maryland Rule B12 to other rules specifying time limits and insisting that the Circuit Court had an absolute duty to dismiss the appeal.

Before commenting on the Commission's argument, we should take note of the rule itself.

Maryland Rule B12, which is part of the rules governing appeals from administrative agencies, provides, in relevant part, that:

"Within 30 days after being notified by the clerk of the filing of the record, the appellant shall file a memorandum setting forth a concise statement of all issues raised on appeal and argument on each issue, including citations of legal authorities and references to pages of the transcript and exhibits relied on."

The rule, patterned after a local second circuit (upper Eastern Shore) rule, was formally adopted by the Court of Appeals on October 1, 1980, to become effective, along with a number of other new and amended rules, on January 1, 1981. Notice thereof was given in the Maryland Register on October 17, 1980 (7:21 Md.R. 1975, 1980).

It has often been said that the Rules of Procedure adopted by the Court of Appeals "are not guides to the practice of law but precise rubrics 'established to promote the orderly and efficient administration of justice and [that they] are to be read and followed.'" *Countess v. State,* 286 Md. 444, 463 (1979), quoting from earlier cases. It has also been made clear that when such a rule says that something "shall" be done, the Court jolly-well means for it to be done; the direc-

tion is a "mandatory" one and must be obeyed. *Cf. In Re James S.,* 286 Md. 702 (1980), involving a statutory time requirement.

Maryland Rule B12 is such a rule. It is a "precise rubric" adopted by the Court "to promote the orderly and efficient administration of justice," and it is meant to be obeyed. But the rule does not specify or mandate any particular sanction for its violation.

It is true, as the Commission points out, that the appellate courts in this State have, on frequent occasion, dismissed proceedings or otherwise precluded the admission of evidence or the consideration of issues because of a litigant's failure to comply with mandatory time or procedural requirements. *See, for example, Salisbury Bd. v. Bounds,* 240 Md. 547, 553 (1965); *Warmack v. Bradley Club,* 242 Md. 394 (1966); *Jacober v. High Hill Realty, Inc.,* 22 Md.App. 115, *cert. den.* 272 Md. 743 (1974), and cases cited therein; *Laukenmann v. Laukenmann,* 17 Md.App. 107 (1973); *State v. Hicks,* 285 Md. 310, and on reconsideration 285 Md. 334 (1979).

In some instances, the applicable rules either require or expressly permit an extreme sanction for violation of the procedural requirements which they or other rules establish. *See, for example,* Maryland Rules 835, 1035, B5. In other cases, the rules provide either no specific sanction or offer a range of alternative sanctions, in which event the courts have tended to balance the purpose and importance of the requirement against the circumstances of its violation. *State v. Hicks, supra* was such a case, as was *In Re Dewayne H.,* 290 Md. 401 (1981).

We would regard dismissal of an administrative appeal as an appropriate, and perhaps even a preferred, sanction for failure to comply with Maryland Rule B12; but we do not believe that it is a mandatory sanction required to be applied indiscriminately in all cases. The trial court, we think had some discretion in the matter. The time period specified in the rule is not jurisdictional in nature, and we regard it of some significance that, in light of the controversy surrounding its more or less contemporaneous decision in

*Hicks* (and *Johnson v. State,* 282 Md. 314 (1978)), the Court of Appeals chose not to specify dismissal as a required sanction.

There is no evidence in this record that either the court or the Commission was seriously inconvenienced, much less prejudiced, by People's Counsel's lateness in filing the memorandum of law. The rate increase remained in effect pending the appeal. Given the newness of the rule, its limited publication, and the Commission's own dereliction in transmitting the record to the wrong court, we do not believe that the court abused its discretion in declining to dismiss the appeal.

### (2) *People's Counsel's Appeal*

Having won the procedural battle, People's Counsel will now proceed to lose the war.

The jurisdiction and powers of the Public Service Commission extend to all public service companies operating a utility business, to the full extent permitted by the Constitution and laws of the United States. Md. Code Ann. art. 78, §§ 1, 23. The Commission is authorized, and obliged, by § 56 of art. 78, to

> "supervise and regulate all public service companies subject to its jurisdiction to *assure their operation in the interest of the public and to promote adequate, economical, and efficient delivery of utility services in the State* without unjust discrimination, giving consideration to the public safety, the economy of the State, the conservation of natural resources, and the preservation of environmental quality." (Emphasis supplied.)

A major component of the Commission's overall regulatory authority is the power conferred by § 68 (a) of art. 78 "to determine just and reasonable rates of public service companies, whether as maximum, minimum[,] or maximum and minimum, respectively." Section 69 (a) defines "just and reasonable rates" as those

"which are not in violation of any of the provisions of this article [78], which fully consider and are consistent with the public good, and which will result in an operating income to the public service company ... yielding, after reasonable deduction for depreciation and other necessary and proper expenses and reserves, a reasonable return upon the fair value of the company's property used and useful in rendering service to the public."

If a public service company proposes a new rate, the Commission may suspend it and institute "proceedings as to the justice and reasonableness of the rate suspended." Section 70 (a) and (b). Under § 71 (a), the Commission may also, after "due hearing," fix temporary rates for a public service company that are either higher or lower than those currently in effect. Such action may be taken only if

"(1) the Commission finds pending a final rate proceeding, that the rates in force are either higher or lower than just and reasonable rates as defined in § 69 of this article and (2) the Commission finds that such temporary rates are necessary in the interest of justice in view of the length of time which must elapse before a final order can be entered."

A great deal of discretion is necessarily vested in the Commission in order that it may properly discharge its important and complex duties. Commission decisions are presumptively correct, and, though subject to judicial review, they are to be affirmed unless found to be illegal or unsupported by substantial evidence. See art. 78, § 97; *Williams v. Public Service Comm'n,* 277 Md. 415 (1976); *Public Serv. Comm'n v. Balto. Gas & El.,* 273 Md. 357 (1974). A reviewing court may not substitute its judgment for that of the Commission, and indeed it "should not examine the facts in any case further than to determine whether there was substantial evidence to sustain the order." *Sports Daily v. Public Service Comm.,* 179 Md. 355, 365 (1941); *see Crisfield v. Public Service Comm.,* 183 Md. 179, 185 (1944).

The Legislature, in its wisdom, has chosen to regard taxicabs as public service companies subject to Commission jurisdiction. *See* art. 78, § 2 (o) defining "public service company" as including a "common carrier company" and § 2 (d) defining "common carrier" as including a "taxicab company." *See also* § 2 (w) defining "taxicab." Each taxicab must be separately licensed, and each licensee, whether an individual or other legal entity, is regarded as a separate taxicab company and thus a separate public service company. *See* art. 78, § 45, and *cf. Albert v. Pub. Serv. Commission,* 209 Md. 27 (1956).

There are approximately 1,150 licensed taxicabs operating in Baltimore City. Some of the licensees drive their own cabs; most do not. In the majority of cases, according to the record, the licensees employ drivers on a contract basis, these drivers (in Baltimore City) being separately licensed as taxicab drivers by the Commission. *See* art. 78, §§ 50A, *et seq.* Most of the taxicab licenses in the City are held by people or companies who have become part of a larger group or association and identify their cabs with the association name — Yellow Cab, Arrow Cab, Checker Cab, etc.

The Commission historically has treated all these licensees as a group for rate-making purposes. Rather than determine a "just and reasonable rate" for each cab based upon each licensee's income, expenses, assets, and liabilities (which would entail 1,150 separate rate cases and likely produce hundreds of different rates), the Commission has established a uniform schedule of rates for all licensed cabs in the City. That is not, of course, the approach taken with respect to other utilities, where the public service companies tend to be much larger but far fewer in number and are required to justify individual rate schedules. The validity and reasonableness of the Commission's general approach to regulating taxicab rates is not challenged in this appeal.

In November, 1979, after a full rate hearing, the Commission approved a new rate schedule for the licensed cabs in Baltimore City (Case No. 7342, Order No. 64098). The new rates, which permitted a charge of eighty cents for the first

one-sixth of a mile, were based on financial data for the twelve-month period ending March 31, 1979.

On May 16, 1980, entities holding 895 of the 1,151 licensed cabs in the City petitioned for both a temporary and a permanent rate increase, seeking to charge an additional twenty cents ($1.00) for the first one-sixth of a mile. The basis of their request was that, since the November order, "the cost of taxicab vehicles, gasoline, oil, materials, parts, tires, labor, maintenance, liability insurance and other insurance and costs have increased substantially, and the operations are increasingly continuing with large losses."

At the hearing conducted on the request for temporary rates, it was made clear that the entire twenty-cent increase was necessitated by an increase in gasoline prices and would be passed on, in its entirety, to the drivers. Evidence presented by the licensees showed that:

(1) The prevailing practice in Baltimore City was for the drivers, who were employed as independent contractors by the licensees, to pay for the cost of gas used on their shifts;

(2) Since March, 1979, the price of unleaded gasoline used by the cabs had increased by an average of 67% — from 76.5 cents/gallon to $1.27/gallon;

(3) On the average, that increase represented an additional cost to the driver of about $6.00 per shift;

(4) As a result, many drivers had either quit or reduced their hours, thus idling a number of cabs and reducing the overall cab service in the City; and

(5) Assuming an average of twenty-five trips per shift, the additional twenty-cent fare would bring the driver $5.00 more per shift, thus helping to offset the $6.00 increase in gasoline cost.

Upon the assurance that the entire twenty-cent increase would be passed through to the drivers, and that no attempt would be made by the licensees to recoup any part of it through rental increases, the Commission, on June 13, 1980, passed an order (No. 64336) authorizing each licensee in the City "to collect a temporary surcharge of twenty cents ($.20)

per trip, in addition to the metered fare, for taxicab service furnished in Baltimore City, Maryland."

On October 21, 1980, a hearing was conducted before a Commission hearing examiner *(see* art. 78, §§ 16 (b), 20 (b)) on the request for permanent increase. Without objection, "all of the exhibits and all of the testimony and the findings at the hearing in the temporary rate case" were judicially noticed and "merged into this case." Essentially the same evidence was presented again by the licensees, only in somewhat greater detail. Gasoline costs had dropped a little since May, but were still about 57% greater than in March, 1979. Drivers faced with that increased expense, had either quit altogether or reduced their hours of work. As a result, shifts were down and overall revenues to the licensees had declined. The goal of the requested increase was to bring the drivers back, increase the shifts, and in that way improve the efficiency and profitability of the licensees' operations. Once again, it was proffered that the entire increase would be passed through to the drivers, and that none of it would be retained, or recouped, by the licensees.

The petitioners presented very little specific information about their own financial affairs and condition, apparently on the theory that, since the entire increase would be retained by the drivers, their financial status was not relevant. Such a theory, as People's Counsel rightly complains, is most certainly not a valid one. It is the licensees, not the drivers, who charge and must justify the new rates; and it is *their* financial condition, not that of the drivers, which is most relevant. The mere fact that one item of expense — gasoline — has increased would not, of itself, justify a rate increase, especially in the absence of evidence indicating an inability of the licensees to adjust their contract with the drivers and, directly or indirectly, absorb that increase. This is the crux of People's Counsel's appeal, and it is a matter also noted by the Commission's hearing examiner.

The fact is, however, that the record *does* contain evidence regarding the overall financial condition of the licensees; and it is on that basis that we shall affirm.

At least two witnesses — Mr. Joseph on behalf of the Sun and Checker cabs and Mr. Granat on behalf of the Arrow cabs — testified that since 1979 their overall costs had increased and, because of reduced shifts, their revenues had declined. Mr. Joseph stated that since 1979 "[t]he shifts have been down," "[r]evenues have been reduced," and "[t]he cost of gasoline has gone up, auto parts has [sic] gone up, general overhead has gone up." Yellow Cab Co., he said, was "in a worse financial position in the first eight months of 1980 than it was in the first eight months of 1979." Mr. Granat presented similar testimony with respect to Arrow cabs: "Well, I can state without any hesitation that the revenues and the net end of the operation has been substantially reduced over 1979." An exhibit prepared by Granat showed that, for his association, net profits for the first eight months of 1980 had declined by $20,000 (from $97,000 to $77,000) from the corresponding period in 1979, and that the average profit *per cab* was only $891 for that eight-month period.

The hearing examiner decried the lack of better evidence, but nonetheless found:

> "The limited evidence on the record in this case indicates that the cost of providing taxicab service has increased. While the evidence concerning the rise in the cost of gasoline can be viewed industry-wide, the testimony from representatives of two taxicab associations — that owner revenues have decreased because of a reduction in the number of shifts being driven — can only be inferred for the rest of the industry. The Hearing Examiner believes, however, that this is a reasonable inference.

> The fare increase proposal would produce no increase in the owners' per-shift revenue; the increase in revenues would go to the drivers to help defray the higher cost of gasoline. Like other public services, taxicab fares should reflect the cost to provide the service. Accordingly, based upon the overall evidence, the proposed fares will be authorized so that the increased revenues will go to the

driver to help defray the cost of gasoline. Increased revenues for the drivers, it is anticipated, will also improve the utilization of idle cabs (to the extent that underutilization exists) to the benefit of the riding public. . . ."

On appeal, the Commission adopted the examiner's recommendations, finding:

"The record in this proceeding indicates that the requested increase in fares would produce no increase in the owners' per-shift revenue, but would be retained by the taxicab drivers to offset their cost of gasoline. We find that the evidence supports an increase in fares to cover the higher cost of gasoline which, in turn, increases the cost of providing taxicab service in the City of Baltimore."

The weight to be accorded the kind of evidence presented at the two hearings, unsupported by audited financial statements, was for the Commission to determine. It was entitled to believe that Messrs. Joseph and Granat knew whereof they spoke and were presenting an accurate depiction of the current financial condition of the licensees. If, indeed, overall expenses were up and revenues were down, the licensees would not be in a position to defray the increased cost of gasoline.

In short, People's Counsel's assertion that "the applicants failed to present any evidence at all regarding the financial condition of their companies and sought an increase by the simple process of establishing the fact that gasoline prices had risen" (Brief, p. 6) is simply not supported by the record. There *was* such evidence presented. It was scanty and largely undocumented; but it was there.

*Judgment affirmed; appellant to pay the costs.*