516 A.2d 599

**MARYLAND PEOPLE'S COUNSEL et al.**

v.

**Frank O. HEINTZ et al.**

**No. 51, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Nov. 5, 1986.

Certiorari Denied March 23, 1987.

Gregory V. Carmean (John M. Glynn, on the brief), Baltimore, for appellants.

Kirk J. Emge (Sandra Hall-Eckroade, on the brief), Baltimore, for appellee, Public Service Com'n of Maryland.

Glenn A. Stover (Stephen J. Sfekas, Miles & Stockbridge, Valerie A. Zimkus, and Michael J. Morrissey, Fairfax, Va., on the brief), Baltimore, for appellee, AT & T Communications of Md., Inc.

Argued before BISHOP and ROSALYN B. BELL, JJ., and JAMES S. GETTY, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

ROSALYN B. BELL, Judge.

This case is a direct result of the court-approved plan which divested American Telephone and Telegraph Company (AT & T) of its allegedly monopolistic position in telecommunications. *See United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131 (D. D.C. 1982), *aff'd mem. sub nom., Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). At issue is the post-divestiture regulation by the Maryland Public Service Commission of rates for interexchange telecommunications in Maryland. The Office of People's Counsel, appellant,[1] asks us to hold that the rates established were unjust and unreasonable. We decline that request.

For the purpose of telecommunications regulation after the divestiture, the United States District Court divided Maryland into four geographic areas called Local Access and Transport Areas (LATAs). Interexchange telecommunications are communications that originate in one LATA and terminate in another—in other words, long distance communications within the State of Maryland. Prior to divestiture the Chesapeake and Potomac Telephone Company (C & P), a wholly-owned AT & T subsidiary, provided this service subject to regulation by the Maryland Public Service Commission. After C & P was divested from AT & T, C & P was only permitted to provide service within each LATA. It was no longer permitted to provide intrastate inter-LATA service or interexchange service.

AT & T Communications of Maryland, Inc. (ATTCOM), appellee, was formed to compete with other long distance companies permitted to provide inter-LATA service in Maryland.[2] In November 1983, ATTCOM filed an application

---

1. GTE–Sprint was a party to the circuit court proceeding. It did not join in this appeal. Frank O. Heintz, appellee, is named in his capacity as chairman of the Maryland Public Service Commission.

2. To accomplish this, the United States District Court ordered C & P to transfer to ATTCOM those facilities and personnel which had previously been necessary to provide this service.

with the Public Service Commission seeking permission to provide interexchange telephone service in this State beginning January 1, 1984,[3] and seeking approval of its proposed tariffs. These tariffs would have produced $13,700,000 more in revenues for ATTCOM than C & P's rates for the same service at that time.

The Commission granted ATTCOM permission to provide interexchange service but directed the company to refile its proposed tariffs reflecting (1) any approved access charge for C & P authorized in an unrelated pending rate case,[4] (2) a rate of return equal to C & P's authorized rate of return[5] determined in that unrelated case, and (3) an effective date of December 31, 1983.

ATTCOM complied with the Commission's directive and refiled proposed rates this time generating $119,331,000 in gross annual revenues. The Commission approved the proposed tariffs in an order dated December 30, 1983. According to the order, the Commission suspended the proposed tariffs for one day and allowed them to become effective on

**3.** At the time of the filing, ATTCOM, a subsidiary of C & P, was to be spun off from C & P on January 1, 1984 as part of the division of the Bell System.

**4.** On June 3, 1983, C & P filed with the Public Service Commission an application requesting authority to increase and restructure its schedule of rates and charges to produce approximately $218,500,000 in additional revenues effective July 6, 1983. The Commission suspended the proposed rates for 180 days pending an investigation into the reasonableness of the proposed rates.

The access charge is the charge C & P would receive from ATTCOM for the use of C & P's facilities.

**5.** The rate of return, as will be discussed, "equals the sum of (1) the cost rate to attract common equity times the ratio of common equity to total capital, plus (2) the cost rate to attract preferred stock times the ratio of preferred stock to total capital, plus (3) the cost rate to attract debt times the ratio of debt to total capital." *Potomac Edison Co. v. Public Service Comm'n,* 279 Md. 573, 579 n. 2, 369 A.2d 1035 (1977).

The rate of return authorized in the unrelated C & P case was 11.91%. In the case *sub judice,* ATTCOM proposed tariffs designed to achieve an overall rate of return of 13.02%, but the Commission utilized the 11.91% figure.

January 1, 1984, subject to a refund following an investigation by the Commission into the reasonableness of the rates.[6]

Extensive hearings were held from April through July pertaining to the reasonableness of the proposed rates, including four evening public hearings at various locations around the State. Testimony was presented by ATTCOM, C & P and GTE–Sprint, the Office of People's Counsel, Federal Executive Agencies and the Commission staff. During the course of the hearings, in addition to evidence of operating expenses and other specific financial data, testimony was presented concerning the manner in which ATTCOM should be regulated by the Commission.

In *Re MCI Telecommunications Corporation,* LXXV Md. PSC 331 (1984), the Commission determined that non-dominant carrier MCI, which was formed to compete in the interexchange telecommunications market, was not to be regulated as traditional utilities had been in the past.[7] Debate centered around whether ATTCOM should be accorded the same treatment as a nondominant carrier since it was a subsidiary of former monopolistic C & P. The economists who presented testimony differed in opinion as to whether ATTCOM should be regulated in the same manner as traditional telephone companies in light of the

---

6. The Office of People's Counsel asserts that the normal practice of the Commission is to suspend the proposed rates for 180 days and docket an investigation into the reasonableness of the proposed tariffs as was the course of action in the unrelated C & P case.

    Md.Code Ann. Art. 78, § 70(c) (1957, 1980 Repl.Vol.) provides that rates may go into effect before a final order in the proceeding is entered, and the Commission may order the proponent of the rates to keep a detailed record of the amounts received by reason of the new rates and require a refund if the Commission finds the rates unjustified.

7. As will be discussed, the Commission ruled that the rates set by this carrier are presumptively reasonable and no investigation into their reasonableness is mandated unless the Commission determines otherwise.

divestiture and resultant competition for intrastate interexchange service.

The Commission staff concluded that although ATTCOM retained considerable market power in the interexchange market, major changes in the telecommunications industry had subjected all of the providers of interexchange service in Maryland, including ATTCOM, to potential and actual competition. Thus, the staff recommended that the Commission gradually reform its regulation of ATTCOM away from traditional policies and practices.[8]

After reviewing all the evidence, the Commission concluded the staff's approach was correct. Specifically, the Commission ruled that while continued rate regulation of ATTCOM was required, ATTCOM should have the opportunity to operate efficiently in the competitive interexchange market and to have some flexibility in adjusting its rates in response to these competitive forces. The Commission also concluded that this flexibility would be in the public's best interest.

The Commission established a revenue requirement of $114,342,000. This determination was made pursuant to Md. Code Ann. Art. 78, § 69(a) (1957, 1980 Repl.Vol., 1986 Cum.Supp.) which requires setting a revenue requirement based on rate base, rate of return, and operating expenses.[9] The Commission then took this revenue requirement and created a "range of reasonableness" around the revenue figure. This range then was to serve as the basis for the setting of just and reasonable rates.

With respect to the establishment of these flexible rates, the Commission found that it was not wholly appropriate to rely exclusively on cost-of-service evidence and the "tradi-

8. ATTCOM did not cross-appeal its treatment by the Commission as a quasi-traditional utility.

9. As will be discussed, the statute sets out a formula based on numerous calculations to yield a revenue requirement. This revenue figure in turn then serves as the basis for the fixing of just and reasonable rates.

tional" rate-making revenue requirement methodology to develop rates for ATTCOM. The Commission established this zone of reasonableness based upon several factors, especially the changing competitive market and the financial characteristics of ATTCOM. In view of this changing competitive market and ATTCOM's financial situation, the Commission concluded that it was necessary to authorize a margin of variance around the revenue requirement figure yielded by applying the traditional rate-making approach. The Commission opined that 5% below the revenue requirement determined by the traditional approach would allow for the setting of just and reasonable rates, and rates yielding $119,331,000 proposed by the Company were set as the maximum flexible rates. The Commission granted ATTCOM the flexibility to set its rates to yield a maximum of $119,331,000 and to reduce its rates to yield a minimum of $108,631,000, thus producing this "range of reasonableness."

The Office of People's Counsel appealed this decision to the Circuit Court for Prince George's County. The circuit court affirmed the Commission's decision. This appeal arises from that affirmance. On appeal, the Counsel contends:

"I. [Md.Code Ann. Art. 78,] Section 69(a) [ (1957, 1980 Repl.Vol., 1986 Cum.Supp.) ] mandates that the findings on rate base and rate of return must be applied in determining just and reasonable rates.

"II. [Md.Code Ann. Art. 78,] Section 68(a) [ (1957, 1980 Repl.Vol., 1986 Cum.Supp.) ] does not broaden the Commission's authority in determining the revenue requirement.

"III. The rates finally approved by the Commission [are] unjust, unreasonable and unlawful."

## I. SCOPE OF REVIEW

Before we address the merits of appellant's contentions, we note that a great deal of discretion is necessarily vested

in the Commission. *People's Counsel v. Public Serv. Comm'n,* 52 Md.App. 715, 722, 451 A.2d 945 (1982), *cert. denied,* 295 Md. 441 (1983). The limited scope of judicial review of Commission decisions is set out in Md.Code Ann. Art. 78, § 97 (1957, 1980 Repl.Vol.):

> "Every final decision, order, rule or regulation of the Commission shall be prima facie correct and shall be affirmed unless clearly shown to be (1) in violation of constitutional provisions, or (2) not within the statutory authority or jurisdiction of the Commission, or (3) made upon unlawful procedure, or (4) arbitrary or capricious, or (5) affected by other error of law, or (6) if the subject of review is an order entered in a contested case after hearing, such order is unsupported by substantial evidence on the record considered as a whole."

Specifically, a Commission decision is "prima facie correct and the burden is on those who seek to set it aside on appeal to show by clear and satisfactory evidence that there is illegality or unreasonableness." *Baltimore Gas & Elec. Co. v. McQuaid,* 220 Md. 373, 387, 152 A.2d 825 (1959); *Public Serv. Comm'n v. Delmarva Power & Light Co.,* 42 Md.App. 492, 499, 400 A.2d 1147, *cert. denied,* 286 Md. 746 (1979).

In *Baltimore Transit Company v. Public Service Commission,* 206 Md. 533, 558, 112 A.2d 687 (1955), the Court of Appeals noted that a reviewing court must accord the Commission "the respect due an informed body aided by a competent and experienced staff." That observation is particularly appropriate in the area of telecommunications today.

## II. STATUTORY FRAMEWORK

The jurisdiction and power of the Public Service Commission extends, to the extent permitted by the laws of the United States, to all public service companies operating a utility business. Md.Code Ann. Art. 78, §§ 1, 23 (1957, 1980 Repl.Vol.). The Commission is empowered to

"supervise and regulate all public service companies subject to its jurisdiction to assure their operation in the interest of the public and to promote adequate, economical, and efficient delivery of utility services in the State without unjust discrimination, giving consideration to the public safety, the economy of the State, the conservation of natural resources, and the preservation of environmental quality."

Md.Code Ann. Art. 78, § 56 (1957, 1980 Repl.Vol.). To carry out this function, "[t]he powers of the Commission shall be liberally construed; and the Commission shall have the powers specifically conferred ... and also all implied and incidental powers necessary and proper to carry out effectually the provisions of [Article 78]." Md.Code Ann. Art. 78, § 1.

A public service company is required to "[c]harge just and reasonable rates, in accordance with the provisions of [Article 78], for the utility services rendered by it." Md. Code Ann. Art. 78, § 28(d) (1957, 1980 Repl.Vol.). ATTCOM is a public service company and is subject to the Commission's authority. Md.Code Ann. Art. 78, § 2(*o* ), (z) (1957, 1980 Repl.Vol.). Section 68(a) of that Article provides the Commission with "the power to determine just and reasonable rates of public service companies." Md.Code Ann. Art. 78, § 68(a) (1957, 1980 Repl.Vol., 1986 Cum.Supp.). Specifically, § 68(a) provides:

"The Commission shall have the power to determine just and reasonable rates of public service companies, whether as maximum, minimum or maximum and minimum, respectively. The rates so determined shall be fixed by order to be served upon each public service company affected thereby."

"Just and reasonable rates" contained in § 68(a) are defined in Md.Code Ann. Art. 78, § 69(a) (1957, 1980 Repl.Vol., 1986 Cum.Supp.):

"(a) ... 'Just and reasonable rates' means rates which are not in violation of any of the provisions of this article, which fully consider and are consistent with the public

good, and which will result in an operating income to the public service company, except carriers of inflammables, yielding, after reasonable deduction for depreciation and other necessary and proper expenses and reserves, a reasonable return upon the fair value of the company's property used and useful in rendering service to the public."

## III. STATUTORY AUTHORITY TO SET RATES

The proper reading of § 68(a) and § 69(a) is the primary issue in this case. Appellant contends that under these two provisions, the Commission is required to follow what is known as the traditional rate-making methodology when setting just and reasonable rates. Appellant argues that only the traditional method will yield just and reasonable rates, and any deviation from that method is not within the Commission's statutory authority and is arbitrary or capricious. We disagree with both arguments. We need to set out first what has been termed the traditional method for rate making.

### Traditional Rate Making

Under § 69(a), the legislature set out the traditional formula to establish the required revenue for a utility. This formula is best illustrated by the following simplistic equation:

$$R = O + (V - D)r$$

where R = total revenue required; O = operating expenses; V = value of property; D = depreciation; and r = rate of return. The property value minus depreciation yields the rate base. The public service company's required revenue is derived after adding the operating expenses to the product of the rate of return times the rate base. Just and reasonable rates are then set from this revenue figure taking into consideration the public's interest in receiving adequate and efficient service. Traditionally, a just and reasonable rate was that rate which produced the required revenue figure.

Under the traditional rate-making approach, the Court of Appeals has consistently interpreted the Public Service Commission Law to require findings with respect to rate base and a reasonable rate of return in establishing the revenue requirement and in turn just and reasonable rates. Decades prior to the 1955 codification of § 69(a), the Court of Appeals determined that the Commission was authorized to determine the fair value of a utility's property. *Havre de Grace & Perryville Bridge Co. v. Public Serv. Comm'n*, 132 Md. 16, 27, 103 A. 319 (1918). In *Miles v. Public Service Commission*, 151 Md. 337, 339, 135 A. 579 (1926), the Court of Appeals again stressed that ascertaining the fair value of a public service corporation's property and in turn its rate base "is to enable the commission to determine the rate allowed, in order that the public may receive adequate and safe service at a reasonable price...." More recently, in *Chesapeake and Potomac Telephone Company v. Public Service Commission*, 201 Md. 170, 181, 93 A.2d 249 (1952), the Court rejected abandoning the fair value test stating that the test "is explicit" in Maryland. Two years later the Court reaffirmed that position: "This being so, a finding of a fair rate base and the setting of a reasonable return thereon are requisite." *Baltimore Transit Co.*, 206 Md. at 542, 112 A.2d 687.

After the codification of § 69(a), the Court continued to adhere to its position that § 69(a) requires that the Commission determine the revenue requirement based on its findings on rate base and rate of return. In *Hagerstown v. Public Service Commission*, 217 Md. 101, 111–12, 141 A.2d 699 (1958), the Court noted that the provisions of newly codified § 69(a) were implicit before 1955 and stated: "There is no indication that what is now section 69 of Art. 78 and the closely related section[ ] 68 ... were intended to establish any new or revolutionary method of rate-making." *See Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n*, 230 Md. 395, 411, 187 A.2d 475 (1963) (Commission followed its statutory duty in determining the fair value of the company's property and allowed a rate of

return based upon that fair value); *Potomac Edison Co.,* 279 Md. at 579, 369 A.2d 1035 (ascertainment of fair rate base and setting of a reasonable return thereon are focal points of the typical rate proceeding). Thus, under the traditional approach, the revenue requirement was a fixed figure derived from determining the rate base and rate of return. Just and reasonable rates were then set to yield that exact revenue amount or something less than that amount.

### Section 69(a) and Relationship Between Just and Reasonable Rates and Revenue Requirement

Appellant argues both that the revenue requirement is the only figure that can be utilized to establish a just and reasonable rate or in the alternative that no higher figure may be utilized as the maximum ceiling for a just and reasonable rate. We will consider each argument in turn.

Appellant latches on to precedents cited and asserts that "[b]y ignoring its own finding on rate base and rate of return the Commission in this case not only strayed from the 'typical rate proceeding' but ignored the mandate of Section 69(a)." According to appellant, "[t]he findings required on rate base and rate of return by Section 69(a) are not simply factors which the Commission must consider in discharging its responsibility to set rates but are the essential elements of the fundamental rate-making procedure which is to be applied." Once the Commission has determined the required revenue, it has no discretion in setting rates—just and reasonable rates are those that yield the fixed required revenue.[10]

Appellant theorizes that the rates approved by the Commission should have provided ATTCOM with only the required revenue of $114,342,000 and that the rate-making law does not give the Commission the discretion to set rates

---

**10.** The Commission determined the value of ATTCOM's operating expenses, property, depreciation and rate of return. The resulting total revenue required was $114,342,000. Appellant does not contest any of the values for the variables set by the Commission.

based on a zone around the required revenue figure. We disagree.

■ There is no doubt that under § 69(a), the revenue requirement arrived at must be tied to the rate base and rate of return set by the Commission. The Commission did not ignore its findings on rate base and rate of return. It used them to arrive at a revenue figure and then created a margin of variance around that figure to set just and reasonable rates. The range of rates was approved to further the public interest in achieving adequate and safe service as § 69(a) mandates the Commission must do when setting rates. The figure yielded pursuant to the traditional formula ensures that the utility can "make ends meet." The formula also ensured that the public receive safe and adequate service when a monopolistic telecommunications market existed. Absent those stable market conditions, that bare formula may not yield adequate income for the utility to continue to deliver safe and adequate telecommunications. When this situation happens, as in the case *sub judice*, § 69(a) permits the Commission to derive a just and reasonable rate at variance with the revenue figure to promote the public interest.

■ Even under the traditional model, however, the Commission's ruling was proper. The Commission set a revenue requirement based on the rate base and rate of return. The Court of Appeals has emphasized that there is no fixed formula for arriving at or calculating these figures. The Court has already established a "zone of reasonableness" around those two individual elements:

"There is no requirement that there must be any given percentage of return on the fair value of property. Between the lowest return that is not unreasonable to the point of being confiscatory and the highest that is not inordinate, there is a rather wide zone in which a return may be reasonable under some circumstances and not under others. In deciding that the return allowed was reasonable, the Commission took into account, as it point-

ed out, that the Company does not enjoy a monopoly, as other utilities do, that its business is shrinking while that of the others is growing, that they need more capital for increased service and it does not."

*Baltimore Transit Co.*, 206 Md. at 555, 112 A.2d 687. Thus, it is clear there is a zone around those figures which will be deemed reasonable. *See also Chesapeake & Potomac Tel. Co.*, 201 Md. at 190, 93 A.2d 249. Included in the determination of the reasonableness of the zone around the rate of return and rate base is whether the company faces competition.

If the Commission is permitted leeway to determine the rate base and rate of return, but prohibited from exercising discretion in arriving at a just and reasonable rate based on those figures, this would exalt form over substance. Appellant conceded at oral argument that the Commission has the discretionary power to set the interim figures. This being so, impliedly it has the same discretionary power under Art. 78, § 1 to set the final rates based on the interim elements of the formula.

■ Moreover, there is nothing in rate making which requires that the rate of return be a fixed percentage. *See Baltimore Transit Co.*, 206 Md. at 555, 112 A.2d 687. All that is required is that the Commission determine a "reasonable return." While the Commission established the rate of return at 11.91%, it could have set the rate at the 13.02% figure ATTCOM requested.[11] Had it chosen to do this, the result would have been the same and the crucial issue on appeal would be whether there was substantial evidence to support that figure. Instead, the Commission determined that an overall variance from the revenue figure was appropriate for both the entity and the public good. This action was not contrary to the statute.

---

11. It was agreed during a prehearing conference that the Commission would utilize the 11.91% figure as the rate of return. ATTCOM maintains that the above stipulation did not create a presumption that an 11.91% return was appropriate for ATTCOM.

### Section 68(a) and Maximum Ceiling

Appellant contends that § 68(a) cannot be interpreted to allow the Commission greater authority in setting the revenue requirement than that permitted by § 69(a). Since, as appellant argues, the rate base and rate of return fix the revenue requirement and in turn the just and reasonable rate to be charged, once that revenue requirement is set under § 69(a), the Commission cannot use § 68(a) as authority to deviate from that figure. We do not agree.

Under § 68(a), the Commission has the power to set, *inter alia*, maximum and minimum rates to be charged. Appellant asserts that the required revenue determined pursuant to § 69(a) fixes the ceiling for the maximum rate levels to be set under § 68(a). Otherwise, appellant argues, § 69(a) is rendered meaningless.

Section 69(a) must be read in conjunction with § 68(a). "[W]here statutes relate to the same subject matter, and are not inconsistent with each other, they should be construed together and harmonized where consistent with their general object and scope." *Bridges v. Nicely,* 304 Md. 1, 10, 497 A.2d 142 (1985).

According to appellant's construction of § 69(a), the Commission could only approve rates which would yield the absolute revenue requirement or some figure less than that. This construction would nullify the power given to the Commission in § 68(a) to set "maximum *and* minimum" rates. (Emphasis added.) There is nothing in the legislative history of § 68(a) or the express language of the section which requires the Commission to use the revenue requirement figure as the maximum rate level for just and reasonable rates.

As appellant concedes, § 68(a) was enacted to give the Commission more flexibility over setting rates. In 1910 when the Public Service Commission Law was enacted, the Commission's authority to set rates was to "determine the just and reasonable ... fares ... to be thereafter observed and in force as the maximum to be charged." Md.Code

Ann. Art. 23, § 381 (1939). In 1927, the law was changed which gave the Commission "the power to determine the just and reasonable rates ... to be thereafter observed and in force as the minimum or maximum and minimum to be so charged." Md.Code Ann. Art. 23, § 382 (1939). As *Capital Transit Company v. Bosley*, 191 Md. 502, 511, 62 A.2d 267 (1948), explained, "[t]he power to fix minimum rates apparently relates to prevention of unjust discrimination or destructive competition...." Appellant asserts § 68(a) does not give the Commission discretion to set a variance around the revenue requirement fixed pursuant to § 69(a), but instead only gives it the power to establish rate designs.

The goal of increased flexibility in rate making, codified in § 68(a), would be frustrated and § 68(a) rendered a nullity if § 69(a) were interpreted as appellant suggests. To limit the maximum rate by the fixed revenue requirement would be inconsistent with the maintenance of flexibility. There is nothing in the legislative history which establishes or even suggests that the revenue requirement must serve as the maximum allowable rate level.

In the case *sub judice,* the Commission chose to set a minimum and maximum rate. It used the resulting revenue requirement under § 69(a) as the midpoint range between what figure would yield the maximum just and reasonable rate and the minimum just and reasonable rate. While possibly attackable on other grounds, the Commission could have set the derived revenue requirement as the minimum rate and still have fallen under the aegis of the statute.

### Dual Function in Rate Making

Appellant's interpretation of § 68(a) and § 69(a) ignores the important dual function the Commission undertakes when setting rates. "The commission has the power and authority to require safe and adequate service to the public and to fix such rates as, on the one hand, will be reasonable to the user of the utility and commensurate with the service rendered, and, on the other hand, will produce a fair and reasonable return upon the property or capital invested in

the public service enterprise." *Miles,* 151 Md. at 339, 135 A. 579. While appellant insists that ATTCOM will receive an excessive rate of return, it apparently ignores the Commission's duty to ensure adequate service to the public as well.

In deciding to establish a zone of reasonableness in the case *sub judice,* the Commission agreed with ATTCOM that "[c]ompetition is superior to regulation in achieving the objectives of progressive innovation, efficient supply and lowest practicable overall prices." Moreover, it concluded that based on an analysis of the market conditions in the State of Maryland flexible pricing would be in the public interest. "By preventing [ATTCOM] from rapidly responding to market changes, stringent regulation could keep prices unrealistically high among all [interexchange] carriers." We cannot hold that the Commission exceeded its statutory authority when it took the public good into consideration in establishing flexible just and reasonable rates. While the revenue requirement formula is designed to ensure that ATTCOM can meet its expenses and thus can continue its operations, it may not necessarily ensure that the public interest is best served by rates set at that figure. The setting of just and reasonable rates from a revenue figure must of utmost import ensure that the public receives safe and adequate service. If the revenue requirement figure cannot do that, then under §§ 68(a) and 69(a), the Commission has the power to set rates that may result in more than the revenue figure or less than that amount.

In a case such as this, the use of a flexible pricing zone makes economic sense for ATTCOM as well. The Commission recognized that traditional rate of return regulation and the use of a fixed rate of return percentage are inappropriate for a company with the financial characteristics of ATTCOM, specifically its small rate base and the risk of substantial earnings volatility resulting from its high operating ratio. If the Commission limited ATTCOM's earnings to the derived revenue requirement, there could be

no offset should low earnings result. The Commission appropriately concluded that a range of rates above and below the revenue requirement would give ATTCOM the ability to offset earnings deficits with any earnings surges, an ability every competitive company has including ATTCOM's chief competitors, MCI and GTE–Sprint. As the Commission acknowledged, earnings volatility is usually not experienced by traditional public utilities. By striking an appropriate balance between the public good and the utility's economic well-being, we hold the Commission properly fulfilled its statutory duty.

## IV. ARBITRARY OR CAPRICIOUS

■ Appellant also contends that this proceeding was the only instance where the Commission declined to rely solely on the results derived from the traditional rate-making methodology and hence the decision was arbitrary and capricious. Contrary to appellant's argument, that is not the case.

In *Re MCI Telecommunications Corporation,* the Commission abandoned the use of the traditional rate-making methodology for the nondominant carrier MCI and adopted a framework of streamlined regulation for it. In that case, the Commission ruled that rate changes filed by MCI would be considered presumptively lawful and thus reasonable, without suspension or formal evidentiary proceedings unless the Commission determined otherwise.[12]

The Commission concluded in the case *sub judice* that even though ATTCOM was the heir to C & P's formerly monopolistic interexchange market, it should be given sufficient flexibility to compete due to the market's increasingly competitive nature. While the Commission did not find that

---

**12.** ATTCOM claims that in three other applications filed before the Commission for Western Union, GTE–Sprint and United States Transmission Systems, the Commission again utilized the *Re MCI* framework and approved an unlimited zone around the rates filed by these carriers without investigating the reasonableness of those rates.

ATTCOM's rates should be granted the presumptive lawfulness of nondominant MCI, it did find that permitting ATTCOM to set rates within a defined zone would provide the company with the necessary flexibility to remain economically viable. Thus, in the case of a quasi-dominant carrier in a competitive market, the Commission did not abandon the traditional rate-making methodology, but instead used it as a point of reference in establishing a range of just and reasonable rates.

It is interesting to note that while appellant claims that the formula under § 69(a) is mandatory and has consistently been so, appellant did not appeal the ruling in *Re MCI* or even contest the authority of the Commission to abandon the same statutory section with respect to a nondominant carrier. In fact, appellant filed a brief in *Re MCI* as an intervenor in support of the Commission's discretionary authority to impose flexible rate regulation.[13] Since divestiture and the introduction of serious competition into the telecommunications market, the Commission's decision to deviate from the traditional method of rate making was not arbitrary and capricious.

### V. SUBSTANTIAL EVIDENCE

■ Finally, appellant alleges the rates set by the Commission were unjust and unreasonable. We do not concur. We hold there was substantial evidence in the record to support the established rates.

This Court has held that "[a] great deal of discretion is necessarily vested in the Commission in order that it may properly discharge its important and complex duties." *People's Counsel*, 52 Md.App. at 722, 451 A.2d 945. This discretion is necessary because of the prospective nature of rate making. There is a degree of uncertainty involved

---

**13.** Appellant explained at oral argument that it did not appeal that decision because consumers are not forced to take the services of MCI whereas certain consumers are forced to take the services offered by ATTCOM. There was no evidence of that forced usage.

when the Commission is called upon to set rates for a public service company. *See Baltimore Gas & Elec. Co.*, 220 Md. at 382, 152 A.2d 825. The degree of uncertainty in the case *sub judice* was particularly high because of the relatively recent influx of competition into the interexchange market and because ATTCOM itself was a new entity.

The Commission's decision sets out in detail the reasons why a flexible regulation scheme is necessary in today's interexchange telecommunications market. The decision was based on many factors peculiar to today's telecommunications industry in general and to ATTCOM in particular. There was substantial evidence to support the Commission's finding that ATTCOM is not a traditional public utility and its determination that flexible pricing would achieve a reasonable return for ATTCOM and aid the public by ensuring a competitive atmosphere with reasonable rates.

There was an abundance of testimony, including that presented by appellant's own expert, that ATTCOM is not a traditional monopoly providing interexchange service. Various witnesses stated that the presence of MCI and GTE–Sprint has drastically altered the telecommunications market. In fact, all witnesses agreed that competition was now an influential factor in the interexchange market. The central dispute centered around whether competition in Maryland was strong enough to replace all regulatory oversight embodied in Art. 78, §§ 68(a) and 69(a).

There was also substantial evidence regarding the unique financial characteristics of ATTCOM. Evidence supported the finding that ATTCOM would be an expense-intensive, as opposed to a capital-intensive, utility. That is, its investment in used and useful property would be relatively small in relation to its operating expenses, and as a result, its prices would be, for the most part, determined by the expenses incurred in providing service. A great majority of these expenses would be attributable to access charges paid to C & P over which ATTCOM has no control. Since the divestiture plan required ATTCOM to pay these charges to

C & P for the use of C & P's facilities, the Commission determined that the rates previously approved for C & P would not be reasonable as initial rates for ATTCOM.[14]

The Commission also determined, based on substantial proof, that ATTCOM's small rate base would intensify the effect of even minor fluctuations in revenues and expenses. The Commission determined the rate base of ATTCOM to be approximately $12.2 million.[15] The Commission had before it testimony propounded by ATTCOM of the effect of fluctuations as follows:

> "Relatively small changes in either revenues or expenses could trigger large changes in AT & T Communications of Maryland's financial posture to a degree not previously encountered by the Public Service Commission in the traditional rate base regulation of telephone companies such as C & P.... For example, a 5% decline in revenues would result in a 267% decrease in the Company's rate of return from 11.91% to a *negative* 19.24%. Additionally, a 5% increase in C & P's access charges would result in a 202% decrease in the Company's rate of return from 11.91% to a *negative* 12.15%" (Emphasis in original.)

The Commission also took into account the lack of historical data. ATTCOM was a new telecommunications company created to provide service in an increasingly competitive market. There was no historical data on which to base rates and all figures were prospective. The Commission reasoned that while the specific revenue requirement derived from the use of historical data provides a reasonable basis for determining rates for an established utility operating in a stable, monopolistic environment, that approach cannot properly be used as the sole basis for setting rates for a new entity operating in an ever-changing increasingly

---

**14.** Access charges paid to C & P would amount to 78% of ATTCOM's expenses.

**15.** ATTCOM suggests that in contrast, C & P's recent estimate of its rate base is approximately $1.5 billion.

competitive market. The Commission recognized that the traditional method of rate making presumes that the historical data which is used in the analysis is known and certain. As stated, in the case of a new utility the data cannot be based upon actual operations but must be derived from estimates of the company's operations. Since these estimates may or may not prove to be accurate, pricing flexibility allows for adjustments.

Finally, the Commission noted that with an established utility, it is assumed that the test year relationship [16] between investment, expenses and revenues will continue in roughly the same proportion into the period the authorized rates will be in effect. This in turn presupposes that the conditions under which the utility will be operating will remain relatively stable. For a new entity operating in an increasingly competitive environment, the Commission appropriately decided that such an assumption should not be made. This fact was taken into account by the Commission. Under such circumstances pricing flexibility was proper.

As the Commission concluded:

"To allow for a margin of variance, therefore, we will establish a range of reasonableness around the projected annual revenue requirements which result from our resolution of test year issues in this case. In our judgment, a range of five percent above[17] and below the test year revenue requirement determined herein will provide a reasonable range and allow for just and reasonable rates. We can expect that the competitive market forces, which all parties concede are faced by [ATTCOM] at least to some extent at the present time, will contribute to reasonable pricing policies within that zone of reasonableness."

---

16. ATTCOM submitted data based on a simulated test year. The test year was based on C & P's 1982 historical data.

17. In reality, the Commission did not establish a range of 5% above the revenue requirement, but instead used the $119,331,000 figure proposed by ATTCOM as the maximum flexible rate above the revenue requirement.

The above findings provide a substantial basis for the Commission's decision to apply a flexible pricing zone. The factors considered by the Commission make clear that the Commission could not otherwise assure that any specific rate schedule would be just and reasonable for both the public good and the entity's financial status. To this end, the Commission required ATTCOM to submit detailed reports of the results of its operation. The Commission stated that it would continue to monitor ATTCOM's financial results under the authorized rates for the continued reasonableness of the rate levels.

The Commission's well-reasoned decision was clearly not an abuse of its broad discretion to set just and reasonable rates for public service companies to ensure that the public receives "adequate, economical, and efficient delivery of utility services in the State ... giving consideration to the public safety...." Art. 78, § 56.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.