589 A.2d 982

**GENERAL MOTORS CORPORATION, et al.**

v.

**PUBLIC SERVICE COMMISSION OF MARYLAND, et al.**

**No. 1080, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 13, 1991.

Paul S. Buckley (John M. Glynn, on the brief), Baltimore, for appellant, People's Counsel.

Robert R. Morrow (Earle H. O'Donnell and Sutherland, Asbill and Brennan, on the brief), Washington, D.C., for appellant, GMC.

Sander L. Wise, Allan J. Malester, Charles R. Bacharach and Gordon, Feinblatt, Rothman, Hoffberger & Hollander, on the brief, Baltimore, for appellant, Maryland Indus. Group.

Susan S. Miller (Bryan G. Moorhouse, on the brief), Baltimore, for appellee PSC.

Mark A. MacDougall (Francis X. Wright, Baltimore, Andrew J. Sonderman and Marjorie H. Brant, on the brief), Columbus, Ohio, for appellees, BG & E and Columbia Gas.

John K. Keane, Jr. and Monte R. Edwards, on the brief, Washington D.C., for appellee, Maryland Natural Gas and Frederick Gas Co., Inc.

Argued before WILNER, C.J., and ALPERT and DAVIS, JJ.

WILNER, Chief Judge.

This appeal is from an order of the Circuit Court for Harford County that affirmed two orders of the Maryland Public Service Commission (PSC). It presents substantive and procedural questions of more than passing significance. The substantive questions have to do with the authority of the PSC to preclude local natural gas companies from passing on to their customers certain charges, known as take-or-pay charges, that the Federal Energy Regulatory Commission (FERC) has allowed their suppliers to pass on to them. The major procedural question is whether the orders entered by the PSC were immediately appealable to the Circuit Court. A fair consideration of these issues requires some understanding of the context in which they arise.

### Historical Background

The issues now before us proceed ultimately from some major changes that occurred in the natural gas industry within the past 20 years and the responses made to those changes by both Congress and the FERC. We need not attempt to catalog here, much less discourse upon, all of those changes and responses, about which a great deal has been written, but we think it would be helpful to provide at least a summary sketch of them.

There are four major components to the natural gas industry—the producer who extracts the gas, the pipeline company that transports the gas from the wellhead, the

local distribution company (LDC) that receives the gas from the pipeline, and the ultimate consumer who takes the gas from the LDC. In the 1970's, gas supplies were tight, in part because the wellhead price was Federally controlled at a level below what free market forces would have commanded. In that economic setting, the producers and the pipelines, for their mutual interest, entered into long-term contracts for specific quantities of gas. A common provision of those contracts obligated the pipeline to pay for a specified percentage of the gas it was entitled to receive, whether it took the gas or not. Those provisions became known as "take or pay" (TOP) clauses. The pipelines, in turn, exacted somewhat similar requirements from their customers, the LDCs. Through what became known as "minimum commodity bills" and "minimum take provisions," the pipelines required the LDCs to pay for a minimum volume of gas each month.[1]

In 1978, through the enactment of the Natural Gas Policy Act, 15 U.S.C. §§ 3301 *et seq.,* Congress partially deregulated the wellhead price of gas, intending to foster increased exploration and production by allowing market forces to have a greater influence on price. Production was indeed increased, but demand did not keep pace. Conservation measures, a drop in oil prices causing some consumers to switch from gas to oil, and a recession all combined to slacken demand. For a time, prices remained high despite the glut because of the minimum commodity bill and minimum take provisions, but in 1983–84, the FERC found that the collection of variable costs through minimum commodity bill and minimum take clauses in the pipeline-LDC contracts represented unjust and unreasonable rates and therefore disallowed them. *Elimination of Variable Costs from Certain Natural Gas Pipeline Minimum Commodity Bill Provisions,* Order No. 380, 27 FERC ¶ 61,318; Order No.

---

**1.** The minimum commodity bill was similar to the TOP clause in that it required the LDC to pay for a minimum amount of gas, whether taken or not. The minimum take provision required the LDC to actually take the gas.

380–A, 28 FERC ¶ 61,175; Order No. 380–C, 29 FERC ¶ 61,077; Order No. 380–D, 29 FERC ¶ 61,332 (1984). This left the pipelines bound by the TOP obligations in their contracts with the producers but unable to demand similar protection from the LDCs.

In 1985, the FERC put a further squeeze on the pipelines. The gas purchased by the pipelines was sold not only to LDCs, for further distribution to retail customers, but also to large, principally industrial, consumers for their own use. Many of these large end users would have preferred to purchase the gas directly from the producers and simply pay the pipeline company to transport it, but, largely because of the TOP requirements, the pipelines generally refused to transport gas for third parties, at least where that would have the effect of reducing their own purchases from the producer. By Order No. 436, 50 Fed.Reg. 42,408 (1985), the FERC found that practice unduly discriminatory and required the pipelines to transport gas for third parties, even if that transportation would compete with their own purchases and sales. This was known as the "open access" requirement.

The combination of these orders by the FERC, in light of the then-current market conditions, allowed much lower gas prices to the consumers but put the pipelines in a real bind. As noted in *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d 981, 1021 (D.C.Cir.1987), *cert. denied*, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988):

"At the heart of the industry's immediate problem is the discrepancy between the average cost of gas that pipelines have under contract and the much lower price of gas now available at the wellhead. The essence of that discrepancy is the same whether the pipelines buy over-priced gas and sell it at a loss, or decline to buy such gas and thereby incur take-or-pay liabilities. The price discrepancy represents a sunk loss of billions of dollars (doubtless reflected in actual drilling expenses). At issue among the parties is who should bear it. All actors in the

natural gas industry—producers, pipelines, LDCs and consumers—are candidates for this dismal position."

Indeed, it was precisely because FERC had failed to address the producer-pipeline contracts and thus "the likelihood that pipelines will play the fall guys" (*id.* at 1021) that the *Associated Gas Distributors* Court, though affirming most of Order No. 436, remanded that aspect of the matter to the Commission for further proceedings.

In response to the Court's directive, FERC adopted an "Interim Rule and Statement of Policy" in the form of Order No. 500, 52 Fed.Reg. 30,334 (1987), in which it attempted to deal with the TOP problem. The order is long and complex, but its most relevant features, in terms of this case, were these: First, with certain exceptions, it required producers seeking open access to the pipelines (i.e., requiring the pipeline to transport gas sold directly to an end consumer) to credit the gas so transported against the pipeline's TOP obligation. Second, it provided alternative methods by which pipelines could recover from their customers at least a portion of the costs incurred in settling their TOP obligations. One method, which was both risky to the pipeline and to some extent unworkable, was to allow the pipeline to recover all or some of those costs through individual rate proceedings.

The alternative method, designed to encourage a rapid renegotiation of TOP contracts, allowed a pipeline transporting on an open access basis to recover from its customers, through a fixed charge, from 25% to 50% of its TOP settlement costs provided it agreed not to pass through to its customers an equal percentage of those costs. As part of this alternative method, which represented what the FERC regarded as an "equitable sharing" approach to cost recovery, the pipelines could attempt to recover the remainder of their TOP settlement costs through volumetric surcharges on all gas transported. Both approaches rested on the notion that at least a portion of these costs would be regarded by the Commission as a cost of the commodity

prudently incurred by the pipeline; the alternative approach, in effect, created a rebuttable presumption that if the pipeline agreed to absorb at least 25% of the cost, the remainder could be passed through as prudently incurred without the need for independent examination. The alternative approach initially adopted in Order No. 500 was a temporary one; it was to expire December 31, 1988.

Following the issuance of Order No. 500, and several fine-tunings of it (Orders Nos. 500–A through 500–G), the producers and pipelines in fact renegotiated most of their TOP contracts, to the point that, by the end of 1988, most of the pipelines' potential TOP liability, which at the end of 1985 was estimated to be over $9 billion, had been resolved. But the potential liability remaining still amounted to between $850 million and $2.1 billion, depending on whose figures were accepted.

Orders No. 500 through 500–G were also challenged, and, once again, the Court found fault with what FERC had done in a number of respects. *See American Gas Ass'n v. F.E.R.C.*, 888 F.2d 136 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990). As to the cost recovery mechanism, the Court declared the sunset provision attached to the alternative approach invalid but declined to pass on the validity of the approach itself on the ground that such review was premature. The Court noted, at 152, that the mechanism was regarded by the Commission as a "policy statement" rather than a "definitive rule" and that the orders were interim ones. With the sunset provision stricken, the Court found no reason to interfere with what it concluded was a "tentative agency position," and therefore deferred review until adoption of a final order.

The Commission reconsidered the matter once more and, on December 13, 1989, adopted a "final rule" in the form of Order No. 500–H, *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, FERC Stats. & Regs.

¶ 30,867 (1989). With some additional fine-tuning,[2] that Order essentially confirmed the pass-through provisions included in the earlier interim orders, and, with exceptions not relevant here, that Order was affirmed in *American Gas Ass'n v. F.E.R.C.*, 912 F.2d 1496 (D.C.Cir.1990).

### The More Immediate Context

The pass-through provisions of the Order No. 500 series, as we have seen, focused on the relationship between the pipelines and their immediate customers—the LDCs and the large end users. By one of the two alternative methods, the pipelines were permitted to recover from their customers at least part of their TOP costs. Although the FERC, whose jurisdiction extends only to the interstate aspects of the industry, made no attempt to determine whether, or to what extent, the LDCs could further pass through those costs to *their* customers, it did briefly comment on that matter. In its original interim order, No. 500, the Commission stated that "all segments of the industry should shoulder some of the burden of resolving the [take-or-pay] problem" and that "[t]he method and extent of flowthrough by local distribution companies will be determined by the responsible state regulatory agencies consistent with applicable law."

In a footnote to that last statement, FERC cited *Nantahala Power & Light v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986), without page reference or further explanation. In *Nantahala* and in the later case of *Miss. Power & Light Co. v. Miss. Ex Rel. Moore*, 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988), the Supreme Court had made clear that, under the Federal supremacy and preemption doctrines, the States "may not bar regulated utilities from passing through to retail customers FERC-mandated wholesale rates." *Miss. Power & Light Co.*,

---

**2.** Though adopted as a final order, Order No. 500–H has been amended at least twice, by Orders Nos. 500–I and 500–J. These amendments are not germane to this appeal.

*supra,* at 372, 108 S.Ct. at 2439. This precept, known as the "filed rate doctrine," was described in *Nantahala,* 476 U.S. at 970, 106 S.Ct. at 2358–59, as follows:

"The filed rate doctrine ensures that sellers of wholesale power governed by FERC can recover the costs incurred by their payment of just and reasonable FERC-set rates. When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate.... Such a 'trapping' of costs is prohibited."

A number of parties saw the seeds of inconsistency between the filed rate doctrine, as enunciated in *Nantahala,* and what the PSC later referred to as the "Delphic-like statement" that State Commissions could provide for the "method and extent" of a further pass-through of the FERC-approved TOP costs, and asked for clarification. In one of its subsequent interim orders, the FERC said that it did not believe that *Nantahala* "precludes state regulators from designing LDC rates, or, in appropriate circumstances, from reviewing the prudence of LDCs' purchasing decisions insofar as they affect take-or-pay costs." Apart from a review of prudence, the FERC observed that although the pipelines were allowed to pass through the TOP costs as a fixed charge, those costs were not really fixed costs but were instead related to the acquisition of gas supply. Accordingly, it said:

"[T]he Commission believes state regulators could consider reclassifying take-or-pay costs billed as a fixed charge as commodity costs and incorporating such costs into LDC sales or transportation rates, or both, thereby spreading such costs to the maximum possible extent as well as subjecting them to market forces. Alternatively, state agencies may wish to consider the option of not reclassifying fixed take-or-pay charges and instead allocating such charges to the LDC's customers based on their cumulative purchase deficiencies."

These further statements seemed to reserve for State regulation only two limited aspects of a further pass-through to end users: whether the LDC was prudent in purchasing its gas from a pipeline that accrued the costs and whether the pass-through should be in the form of a fixed charge or a volumetric surcharge. Nothing in that clarification suggested that a State could deny the pass-through for any other reason. In its final order (No. 500–H), however, the FERC, after iterating what it had said earlier, added that "state regulatory agencies may implement, as some have, an equitable sharing mechanism similar to that established by the Commission which requires LDCs to absorb a portion of the costs if they desire to assess a fixed charge." The Commission said nothing about whether an LDC could be made to absorb any part of the cost, other than for imprudence, if it chose to pass the cost through by volumetric surcharges.

### These Proceedings

On July 20, 1988, the Baltimore Gas and Electric Company filed with the PSC a supplement to its tariff to allow it to recover TOP costs that it was required to pay to its supplier, Columbia Gas Transmission Corporation. The company informed the PSC that Columbia was passing through the TOP costs in the form of both volumetric and non-volumetric charges, that it proposed to pass through the volumetric charges on a volumetric basis to its customers, and that it proposed to do likewise with respect to the non-volumetric charges. As to the latter, it expressed the belief that "no single class of customers should singularly bear or be excluded from bearing these non-volumetric surcharges," and so it proposed to apply them to "both sales and Delivery Service," i.e., to both its retail customers and to the large end users who purchased the gas from the producer and were paying only for transportation and delivery services. This was apparently the first filing with the PSC following FERC Order No. 500, and, upon preliminary consideration of it, the PSC, through Order No. 68197,

"determined that a generic proceeding should be instituted to consider jurisdictional, legal and policy issues associated with the recovery by local distribution companies of the take-or-pay costs and charges and that the initial procedure to be followed in this proceeding is to be the filing of briefs on those issues by all Maryland gas distribution companies and other interested persons and the opportunity for replies to those submissions."

That is how the case then proceeded. There were no evidentiary hearings; instead, all interested parties were permitted to present argument with respect to the scope of the PSC's authority under the filed rate doctrine, the FERC orders, and the Maryland statutes to regulate the extent to which and the method by which the LDCs could pass through their TOP costs to their sales and delivery customers.

On December 2, 1988, the PSC issued a comprehensive order in the matter. Order No. 68269, *Re Jurisdictional and Policy Issues Relevant to the Recovery by Local Distribution Companies of Pipeline/Producer Take-or-Pay Costs and Charges*, 79 Md. PSC 436, 99 PUR 4th 23 (1988). It concluded that, under both Federal and State law, it had no authority to preclude the LDCs from passing through their TOP costs except to the extent that those costs arose from imprudent purchases by the LDCs. The underpinning of both conclusions—that based on Federal and that based on State law—was the PSC's perceived inability to declare an FERC-approved charge unjust or unreasonable. The *Nantahala* and *Mississippi Power* cases, said the PSC, simply confirmed the previously established principle that "states cannot question the reasonableness of FERC-filed or fixed wholesale rates" and that it could not "accomplish the same result (without using the word 'reasonable') by declaring that it would be 'equitable,' for reasons other than imprudence of the LDCs, if Maryland LDCs bear some portion of the TOP costs passed through to them by their pipeline suppliers." In discussing the question of Federal preemption, the PSC concluded that,

when the FERC orders were read as a whole, there was no evidence that FERC intended to delegate any of its exclusive jurisdiction to the States, even if legally it could do so.

The alternative conclusion expressed by the PSC, "[a]ssuming, *arguendo*, that the filed rate doctrine and federal pre-emption is not a bar to our denying passthrough of all or a portion of prudently incurred TOP costs," was that State law bars that denial. Md.Ann.Code art. 78, §§ 54 and 54D permit the PSC to allow LDCs to establish a sliding scale for the adjustment of its costs of purchased gas, subject to monthly verification and an evidentiary hearing at least once every six months. The PSC has done so. Section 54D directs the PSC to disallow any gas charge that it finds unjustified upon the failure of the company to follow competitive practices in the procurement and purchasing of the purchased gas "or upon a showing that the company was unreasonable in its fuel procurement and purchasing practices." Those limitations go to prudence, the PSC noted; thus, "[i]f these costs are permitted to be included in the PGA [purchased gas allowance], Section 54D(a) does not permit the Commission to deny an LDC the recovery of prudently incurred TOP costs in order to effectuate an 'equitable' sharing of those costs."

The same result, the PSC concluded, was dictated by § 69(a) of art. 78, which defines "just and reasonable rates" —those which the PSC *must* allow. Under that section, an LDC is entitled to a level of revenue that, after reasonable deduction for depreciation and other "necessary and proper expenses" and reserves, will yield a reasonable return on the fair value of the company's used and useful property. "[A]t a minimum," the PSC held, "it would be contrary to public policy to deny an LDC the opportunity to recover 'necessary and proper' expenses which, we believe, include prudently incurred TOP costs."

LDC-specific issues, including questions of prudence and "the appropriate allocation of those TOP costs, especially the direct-billed fixed monthly TOP charges, among customer classes," the PSC said, can be raised in LDC-specific

proceedings, some of which had already been instituted pursuant to § 54D. But "pending our final decision in the LDC-specific proceedings we have previously instituted or will institute," the PSC determined, "[f]or all of the reasons discussed above," that "TOP costs are sufficiently related to the costs of purchased gas so that they may continue to be collected through the PGA tariffs of each of the Maryland LDCs...." The actual Order of the PSC was that "the findings and principles set forth in the body of this Opinion and Order shall be controlling in the proceedings previously instituted, or to be instituted, to review the incurrence by Maryland gas companies of take-or-pay costs and the passthrough of those costs to end users."

Aggrieved by these conclusions, appellants—Md. People's Counsel, the Md. Industrial Group, and General Motors Corporation—asked for and received a rehearing before the PSC. On January 27, 1989, the Commission issued an Opinion and Order clarifying one aspect of its earlier order but otherwise affirming what it had previously said and done. Order No. 68330, *Re Recovery by Local Distribution Companies of Pipeline/Producer Take-or-Pay Costs and Charges*, 80 Md. PSC 16, 101 PUR 4th 320 (1989). It again made clear that its decision rested on both Federal and State law, either of which would require the result, and that LDC-specific issues could be raised in the LDC-specific proceedings:

> "Under all of the above noted circumstances, we do not believe it was unreasonable to state that unless a party in an LDC-specific proceeding could present evidence, apart from evidence of imprudence, that would justify a disallowance of passthrough of all or a portion of TOP costs by an LDC, such a denial would be unlawful under the PSC Law. In short, although we could have, we have not closed the door in the LDC-specific proceedings against any other arguments based on record evidence, except for those legal arguments we have already rejected ... which might justify or result in the denial of passthrough of less than 100 percent of an LDC's TOP costs. We

cannot, however, conceive of what those other arguments might be."

Still aggrieved, appellants sought immediate judicial review in the Circuit Court for Harford County, complaining almost exclusively about the PSC's conclusion that it was Federally preempted from requiring the LDCs to absorb any part of the TOP costs, other than for imprudence. The one narrow attack based on State law, which General Motors expressly did not join, was that the PSC erred in allowing the pass-through in the form of the purchased gas allowance rather than in the context of a rate hearing at which evidence could be presented. Two of the gas companies responded to that argument by noting that a number of semi-annual PGA reviews had already occurred and requesting either that the appeal be dismissed as premature or that the PSC records in those proceedings be added to the record in the instant appeal. The PSC was more specific. In its Answering Memorandum, it asserted that the orders issued in the instant proceeding were not final, for the purpose of appealability, because they did not finally adjudicate the extent to which the LDCs could pass through the TOP costs. That adjudication, it said, would come in the LDC-specific hearings—the semi-annual PGA reviews or comprehensive rate cases—where prudence issues and some of the other issues raised by appellant could be resolved.

The court rejected the procedural arguments, finding the case ripe for judicial review. The court then proceeded to discuss the Federal preemption issue and to conclude, as did the PSC, that the filed rate doctrine precluded the State from requiring the LDCs to absorb the TOP costs on an "equitable sharing" basis. Finally, it noted the alternative State law basis for the PSC's orders and concluded that, at the very least, the Commission had the authority under § 54D to permit the pass-through even if Federal law did not require it.

Appellants now turn to us, asking the single question: "Whether the Maryland Public Service Commission has the legal authority to consider, and implement if appropriate, an

equitable sharing of take-or-pay costs between Maryland local gas companies and ratepayers?" The argument in their initial brief in response to that question deals entirely with the Federal preemption issue. Nowhere is there any mention of § 54, § 54D, or § 69 of art. 78—the sections relied upon by the PSC to support its alternative basis. The only mention of State law is the broad jurisdiction given to the PSC in §§ 1 and 3 of art. 78, and that is in the context of urging that the Commission exercise its powers to the full extent allowed by Federal law.

Seizing upon the limited scope of appellants' argument, appellees have pointed out that, because appellants have failed to challenge the alternative State-law basis for the PSC's decision, the decision must be affirmed on that basis, thereby making the question of Federal preemption moot. Thus, they urge that we not address the Federal question and simply either affirm the judgment or dismiss the appeal. Two of the appellees, Maryland Natural Gas and Frederick Gas Company, Inc., have asserted two other procedural defenses to the appeal. Picking up on the PSC's argument to the Circuit Court, they insist that the appeal to us is premature because of the open issues to be resolved in LDC-specific hearings. As a corollary to the prematurity argument, they contend that, by not waiting until a final ruling in the LDC-specific cases, appellants have failed to exhaust their available administrative remedies.

### *Appealability—Nature of the PSC Orders*

The right of appellants to appeal the PSC Orders is, of course, a threshold issue that must be resolved before we can properly consider the merits of their cause. There can be no doubt that the appeal to this Court is proper. A final judgment was entered by the Circuit Court affirming the two orders of the PSC, and that is appealable to us under Md.Ann.Code Cts. & Jud.Proc. art. § 12–301. The issue is whether an appeal properly lay to the Circuit Court—whether, in other words, the PSC orders were sufficiently final in nature as to permit immediate judicial review under Md.

Ann.Code art. 78, § 89, allowing the validity of any "rule or regulation" of the Commission to be determined through a declaratory judgment proceeding, or § 90, permitting judicial review of any "final decision or order" of the Commission. This requires us to examine the nature of the proceeding that led to the two orders.

The authority which the PSC has with respect to public service companies subject to its jurisdiction is very broad. The Commission is empowered to "supervise and regulate" those companies "to assure their operation in the interest of the public...." Art. 78, § 56. In implementing that general authority, the Commission may "institute and conduct any proceedings reasonably necessary and proper to the exercise of any of its powers, or the performance of any of its duties," § 62(a), "initiate and conduct any investigation necessary to the execution of its powers or the performance of its duties under this article," § 62A, and "make such reasonable rules and regulations as it deems necessary to carry out the provisions of this article...." § 64. Among the specific powers delegated to the PSC is "the power to determine just and reasonable rates of public service companies," those rates to be "fixed by order to be served upon each public service company affected thereby." § 68(a).

Like its counterparts in the Federal system and in other States, the PSC exercises its rate-setting authority in a number of ways. The most common are whole or partial examinations of the rates of individual public service companies, in what we have referred to in this Opinion as LDC-specific proceedings. The PSC may also influence the rates through the adoption of regulations dealing with such things as accounting systems, billing practices, metering requirements, and the procedure for instituting changes in rates. *See,* in general, COMAR, Title 20.

Somewhat midway between these two approaches is what the PSC calls a "generic proceeding." Such a proceeding is often used to institute and conduct an investigation into general areas of concern that may affect more than one public service company. The instant case was regarded by

the Commission as a generic proceeding. *See also,* by way of example, *Re Interstate Sale and Transportation of Gas,* 77 Md. PSC 164 (1986); *Re Customer-owned Telephone Coin Equipment,* 77 Md. PSC 579 (1986); *Re Generating Unit Performance Program,* 78 Md. PSC 388 (1987). These proceedings are inaugurated by an Order of the Commission which describes the purpose of the proceeding and the procedure to be followed and are terminated by another Order which sets forth the decisions or conclusions reached by the Commission. These may be in the form of recommended legislation (*see Re Continuing Need for Regulation of the Radio Common Carrier Industry,* 78 Md. PSC 440 (1987)), regulations (*see Re Consumer Deposits,* 78 Md. PSC 695 (1977)), or policy statements or determinations that will be routinely applied thenceforth in all specific proceedings to which they are applicable.

The authority of the PSC to conduct generic proceedings has not been challenged and indeed is fairly clear. The question presented is whether the Order terminating them, which *is* the final order or decision in *that* proceeding, is immediately appealable where the decisions announced in the Order are not self-executing but depend for their implementation on further company-specific proceedings. It does not appear that that issue has yet been addressed in Maryland.

██ The general rule, of course, is that "an action for judicial review of an administrative order will lie only if the administrative order is final" and that "[g]enerally, to be final, an administrative order must ... 'leave nothing further for the agency to do.'" *Holiday Spas v. Montgomery County,* 315 Md. 390, 395, 396, 554 A.2d 1197 (1989), quoting in part from *Md. Comm'n on Human Rel. v. B.G. & E. Co.,* 296 Md. 46, 56, 459 A.2d 205 (1983). That rule is usually not very difficult to apply in company-specific proceedings, but in a generic case it becomes somewhat ambiguous. Does the test, "nothing further for the agency to do," refer to the generic proceeding terminated by the order, in which event the order would appear to be final in

every case, or to the directives embodied in the order, in which event finality would depend on the nature of those directives?

In contrast to this general rule, fashioned principally to guide judicial review of specific proceedings, a somewhat looser standard has been applied when review is sought of agency rules or regulations. In *Public Serv. Comm'n v. Md. People's Counsel,* 309 Md. 1, 522 A.2d 369 (1987), the Court had before it an appeal from a regulation instituting new procedures governing the termination of utility service to customers. People's Counsel contended that the regulation was unconstitutional because it permitted, though it did not require, service to be terminated without a hearing. The PSC urged that the appeal was premature because no utility had ever applied or threatened to apply the regulation to terminate service without a hearing.

The Court addressed the ripeness argument and resolved it by adopting the standards set forth in a trilogy of Supreme Court cases—*Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); and *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967). In *Abbott Laboratories,* the Supreme Court said of the ripeness doctrine, 387 U.S. at 148–49, 87 S.Ct. at 1515:

"[I]t is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."

The Court of Appeals adopted this two-step approach: "First, we must determine whether there is any reason to

postpone judicial review. If we find that there is a reason to postpone judicial review, we must then determine if this reason is outweighed by the hardship caused to the parties if review is denied." 309 Md. at 15, 522 A.2d 369.

In determining whether there is any reason to postpone judicial review, the Court stated that it must attempt to conserve judicial resources "for appropriate cases" and must also consider "whether a court can make an informed decision without the benefit of specific facts surrounding the regulation's enforcement." *Id.* at 15–16, 522 A.2d 369. Among the factors to be examined are whether the challenged regulation is "final and effective" or is still open to administrative modification, whether the issue presented is essentially a legal one, which can be decided without the benefit of facts surrounding the enforcement of the regulation, and whether the regulation is discretionary in nature. As to the last of these, the Court observed that the review of a discretionary regulation before the agency discretion has been exercised is a difficult task. If the Court finds some reason to postpone judicial review, it then must look to see what, if any, immediate harm might occur to those subject to the regulation if review *is* postponed.

As we indicated, the kind of generic proceedings conducted by the PSC fall somewhere in the middle between traditional company-specific contested cases and the broader exercise of rule-making authority. At the Federal level, these kinds of proceedings, whether regarded as a kind of informal rule-making or otherwise, have been subjected to an *Abbott Laboratories* analysis. *See Associated Gas Distributors v. F.E.R.C., supra,* 824 F.2d 981, 1031–33; *American Gas Ass'n v. F.E.R.C., supra,* 888 F.2d 136, 151–52; *Wisconsin Gas Co. v. F.E.R.C.,* 770 F.2d 1144, 1167–68 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986); G. Vining, *Direct Judicial Review and the Doctrine of Ripeness in Administrative Law,* 69 Univ.Mich.L.Rev. 1443 (1971). We think that is the appropriate focus, at least with respect to the orders entered in this case. The kinds of decisions enunciated in these orders

have a greater kinship to rules or regulations than to orders entered in company-specific proceedings.[3] They constitute not only statements of policy or interpretation but conclusions of law that the Commission has announced will apply uniformly and "be controlling" in LDC-specific hearings.

We turn then to the first step in the analysis—whether there is any reason to postpone judicial review. In this regard, we observe that, although the PSC was competent to use a generic proceeding to consider the TOP issue, it could have dealt with that issue in one or more LDC-specific cases, where prudence review and the other open issues could also have been resolved. Some, though not all, other State public service commissions have handled the TOP issues in just that way.[4] Indeed, the only two reported cases of State judicial review of TOP decisions brought to our attention or that we were able to locate arose from LDC-specific proceedings. *See Archer Daniels Midland Co. v. Iowa Utilities Board,* 117 PUR 4th 385 (Iowa Dist.

---

**3.** It is indeed arguable that the contents of Order No. 68269 constitute a "regulation" under the State Administrative Procedure Act. Md. Ann.Code State Gov't art., § 10–101(e) defines "regulation" as including a statement that (1) has general application, (2) has future effect, (3) is adopted by a unit to detail or carry out a law that the unit administers or govern practice or procedure before the unit, and (4) is in any form, including a statement of interpretation or policy. We hesitate to conclude in this appeal that the order *is* a regulation because (1) no one has claimed that it is and (2) the record does not establish compliance with a number of the procedural requirements in the Act for the adoption of a valid regulation.

**4.** *See,* for example, *Re Michigan Gas Utilities Co.,* 108 PUR 4th 221 (Mich. PSC 1989); *Re Michigan Consolidated Gas Company,* 111 PUR 4th 307 (Mich. PSC 1990); *Re Missouri Public Service Company,* 110 PUR 4th 446 (Mo. PSC 1989); *Re Iowa–Illinois Gas & E. Co.,* 103 PUR 4th 204 (Iowa UB 1989); *Re Delmarva Power and Light Co.,* 116 PUR 4th 287 (Del. PSC 1990); *Re Northern Indiana Public Service Co.,* 97 PUR 4th 1 (Ind. URC 1988); *compare Re Policy for Recovery of Costs Associated With Take-or-pay Liability,* 102 PUR 4th 190 (Va. SCC 1989); *Re Planning Review, Rate Design, Purchased Gas Adjustment Clauses, Accounting, and Related Matters for Natural Gas Distribution Utilities,* 99 PUR 4th 253 (Wis. PSC 1989); *Re Final Statement of Policy Regarding Recovery of Take-or-pay Expenses,* 104 PUR 4th 185 (Pa. PUC 1989).

Ct. Polk Co. 1990); *General Motors v. Illinois Commerce Com'n*, 191 Ill.App.3d 450, 138 Ill.Dec. 678, 547 N.E.2d 1299 (Ill.App.1989), *petition for leave to appeal granted*, 131 Ill.2d 559, 142 Ill.Dec. 881, 553 N.E.2d 395 (1990). That alone does not require that judicial review be postponed, however. We must still consider the factors set forth in *Public Serv. Comm'n, supra*, 309 Md. at 15, 522 A.2d 369.

The first of these is whether the substance of the order is final and effective, not likely to be changed. It is. Not only has the Commission announced it as a final statement of policy and directed that it be "controlling" in all LDC-specific proceedings, it has denied a motion to reconsider the order and, we are informed, actually precluded evidence bearing on it in LDC-specific proceedings. These same facts compel the further conclusion that the announced policy is not in any sense discretionary; it *will* be and has been applied.

Finally, although appellants urge that the PSC erred by not conducting an evidentiary hearing before announcing the policy, the validity of the policy itself is essentially a legal issue that can be resolved without LDC-specific facts. This is because those defenses to full recoupment by the LDCs which *are* fact-specific, such as imprudent or non-competitive procurement, have not been precluded by the orders now before us. The only substantive issues really before the Circuit Court were whether, in the absence of those or other defenses relegated to the LDC-specific proceedings, the PSC was legally correct in concluding that, under Federal or State law, it had no authority to deny full recoupment of the TOP costs.

Upon this analysis, it appears that, although judicial review *could* be postponed, this is a case in which it should not be. As Judge Cameron said in the Circuit Court, "[b]etter to lay to rest the issues raised by Orders Nos. 68269 and 68330 on a uniform, generic basis so that the LDC-specific cases can be heard on the issues peculiar to each LDC." The Circuit Court did not err in entertaining the action.

*The Merits*

■ As we said before, the entire thrust of appellants' attack, as presented in their initial brief, is on the conclusion that the PSC was precluded by the filed rate doctrine from adopting the "equitable sharing" approach and requiring the LDCs to absorb part of the TOP cost allocated to them by virtue of FERC orders. Appellants maintain that they also challenged the alternative State law ground relied on by the PSC, but their brief does not really set forth such a challenge, except perhaps in the most general way. Normally, such a failure would be tantamount to a waiver of appellate review. *Jacober v. High Hill Realty, Inc.,* 22 Md.App. 115, 321 A.2d 838, *cert. denied,* 272 Md. 743 (1974); *Federal Land Bank v. Esham,* 43 Md.App. 446, 406 A.2d 928 (1979). But such a waiver is not indelibly fixed and automatic. This Court does retain the discretion, which is but sparingly used, to consider an issue that has not been adequately presented in an initial brief. Because of the obvious importance of having prompt appellate review of the PSC's decisions, we shall exercise that discretion in this case and consider the State law ground relied upon by the Commission.

■ Our consideration of the point shall not detain us long. A regulated utility is entitled to "just and reasonable" rates. In setting those rates, the PSC must allow a "reasonable deduction" for "necessary and proper expenses." Art. 78, § 69(a); *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 150, 501 A.2d 1307 (1986). The determination of what is a "reasonable" deduction or a "necessary and proper" expense is left largely to the Commission; its final conclusions in these regards are "prima facie correct and shall be affirmed" unless shown to be unlawful, arbitrary, or, where evidence is necessary to support them, unsupported by substantial evidence. Art. 78, § 97. Thus, judicial inquiry "is limited to finding whether there was illegality or unreasonableness in the Commission's action—when that inquiry is finished, judicial scrutiny ends and the judicial function in the rate making process is

over." *Balto. Gas Co. v. McQuaid,* 220 Md. 373, 382, 152 A.2d 825 (1959); *Potomac Edison Co. v. PSC,* 279 Md. 573, 582–83, 369 A.2d 1035 (1977).

The Commission concluded that TOP costs could properly be treated as "costs of purchased gas." That conclusion is neither illegal, arbitrary, nor unreasonable. Other State public service commissions have reached identical conclusions. *See,* for example, *Re Michigan Gas Utilities Company, supra,* 108 PUR 4th 221; *Re Delmarva Power and Light Company, supra,* 116 PUR 4th 287; *Re Northern Indiana Public Service Company, supra,* 97 PUR 4th 1. Subject to a review of the LDCs' procurement practices, the Commission could thus reasonably find that the TOP costs were "necessary and proper" expenses that should be allowed under § 69 and were "costs of purchased gas" that should be recoverable under §§ 54 and 54D. For these reasons, we find no basis for upsetting the Commission's decisions to the extent they were premised on State law.

Because State law fully justifies the PSC's orders, we need not consider whether those decisions are also required under Federal law. Consideration of the Federal questions would require us to address issues not only of Federal supremacy and preemption but also whether the FERC had, in fact, delegated any of its mandated authority to the States and whether, if it had, that delegation was allowed by the Natural Gas Act, 15 U.S.C. § 717 *et seq.,* and the Natural Gas Policy Act, 15 U.S.C. § 3301 *et seq.* Those are obviously complex questions, and, because our answer to them would not in any way affect the result, there is simply no need to address them in this case.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.